CABBLE et al. v. CABBLE et al.

(Supreme Court, Appellate Division, Second Department.   March 2, 1906.)

1. GUARDIAN AND WARD—SALE OF WARD'S PROPERTY—POWER OF GUARDIAN.
   Where a will made a specific bequest of corporate stock, and the testator's personal property, exclusive of the stock, was sufficient to discharge his debts, the title to the stock vested in the legatees, so that the guardian of infant legatees had power to sell the share bequeathed to them.

2. SAME—ADEQUACY OF CONSIDERATION—EVIDENCE.
   In an action to set aside a sale of corporate stock by a guardian of infants, evidence *held* to sustain a finding that the stock was sold for an adequate consideration.

3. EVIDENCE—OPINION EVIDENCE—VALUE.
   In an action to set aside a sale of corporate stock by a guardian, where the stock had no market value, the exclusion of expert evidence as to its actual value was not error, where all the facts affecting its actual value were presented to the court.

Appeal from Special Term, Kings County.

Action by Walter E. Cabble and others, infants, by Sarah L. White, their general guardian and guardian ad litem, against Albert E. Cabble and others, as executors of Elijah Cabble, deceased, and others. From a judgment dismissing the complaint on the merits, plaintiffs appeal. Affirmed.

Argued before HIRSCHBERG, P. J., and JENKS, HOOKER, RICH, and MILLER, JJ.

Ellis L. Aldrich, for appellants.
I. N. Sievwright and Hubbard Hendrickson, for respondents.

JENKS, J.   Edward Cabble died on February 15, 1889, testate. His brother, Elijah Cabble, and his son Walter Cabble were his executors. He left, him surviving, three sons and five daughters, and certain grandchildren, children of a deceased son. His estate consisted of $16,000 and 40 shares of stock in the William Cabble Manufacturing Company. The scheme of the will that became effective vested the 40 shares in his children and the grandchildren, per stirpes, share and share alike, and gave his other property likewise. The testator died suddenly, and so left an unexecuted will that shifted the scheme, for it vested the stock in his sons exclusively, and gave the other property to the daughters and the said grandchildren exclusively. A few days after his burial the scheme of the unexecuted will was carried out by the adult children. Three months later the mother of the said grandchildren, who meanwhile had become their general guardian, sold all of their interest in the stock to the said three sons of the testator. This is an action in equity brought by three of the said grandchildren, now of age, and by said general guardian and guardian ad litem of those who are infants, against the executors of Edward Cabble and Walter Cabble, deceased, to set aside the general release given to the said Edward and Walter as executors upon the transaction of the sale of the stock, and against the purchasers of the stock to set aside that sale. The Special Term found for the defendants, and dismissed the complaint upon the merits.

The fifth clause of the will is a specific bequest of the said stock, as the testator directed that the shares "shall pass to and vest in my said children equally, share and share alike." Exclusive of this stock, the personal property discharged all of the testator's debts. The title to the stock vested in the legatees. Blood v. Kane, 130 N. Y. 514, 517, 29 N. E. 994, 15 L. R. A. 490; Matter of Mullon's Estate, 145 N. Y. 98, 104, 39 N. E. 821; Chester v. Buffalo Car Manufacturing Company, 70 App. Div. 443, 457, 75 N. Y. Supp. 428. The guardian of the infants had power to sell this personal property (Dwight's Law of Persons and Property, 277; Field v. Schieffelin, 7 Johns. Ch. 150), and therefore the sale was but voidable. I think that the appellants must fail, because all of the proof sustains the findings of the Special Term that the price paid was not inadequate. Even if we concede that the rule, well stated by Kerr on Fraud and Mistake, as follows:

"The principles which govern the case of dealings of persons standing in a fiduciary relation apply to the case of persons who clothe themselves with a character which brings them within the range of the principle, or who take instruments, securities, or moneys with notice that they have been obtained by a person filling a position of a fiduciary character from a person towards whom he stands in such relation"—

applies under the facts of this case, and that, therefore, the burden to show that the price was adequate, so as not to "point directly to wrongdoing" (Bigelow on Fraud, vol. 2, at page 505. See, also, 500 et seq.), was on the purchasers, yet I still think that the appellants must fail. The court finds that the estate in 1889, exclusive of the stock, was valued at $16,224.72, that the value of the stock at that time did not exceed $16,000, and that the value of the $4^4$/$_9$ shares which were sold by the guardian did not exceed $1,776. It finds that the sons paid for the stock to the guardian $388.85, and also executed such releases of their respective one-ninth shares of the estate, to which they were entitled under the will, so that the one-ninth share of the said infants became one-sixth. The guardian was paid, in addition to the one-ninth share to which her wards were entitled under the will, $901.38, representing the amount of the sons' relinquishment; so that the guardian received for the $4^4$/$_9$ shares of the stock in all $1,790.28, or $400 a share—the full value, as found by the court. The shares were of the capital stock of the William Cabble Manufacturing Company, a domestic corporation organized in 1870 for a term of 25 years, capitalized at $30,000, in 300 shares, of a par value of $100 each. It was a small, close, family corporation, in that the stock was owned exclusively by the Cabble family. It owned no trade-marks, copyrights, or patents. It was a going concern, engaged in manufacturing as a competitor in the open markets . The testator was an officer of the company, engaged in its business, and his sons had been from boyhood, and were then, engaged in its business as workingmen. The only witness who gave evidence as to the value of the stock was Joseph C. Cabble, called by the plaintiffs. He had been connected with the company for 30 years, and a stockholder therein since 1879. He appears as indifferent between the parties. He gave a detailed description of the company, its history, and its business as a going concern. He testified that there had been but one sale of the stock at public auction, at a price unknown to him, and

one private sale, 20 years before the time he testified, at $150 a share. On cross-examination he put the value of the stock at the time of the sale now attacked at $400 per share, and he reiterated his valuation on the redirect examination upon his original statement made on cross-examination.

His testimony is criticised upon two grounds: First. In that the inventory of the corporation shows a valuation of $248,095, from which it is argued that, if there were distribution on that basis, each share would be worth $800. I think that we cannot conclude that the inventory of the property of a going concern, made by the officers thereof, is a safe indication of the price that would be realized from a present sale thereof and a distribution thereunder. What property may, in the opinion of its owners, be worth, regarded as in use by a going concern, for inventory purposes, and what it would fetch if the concern were wound up upon sale in open market, may naturally present a great variance. It does not appear that the inventory was on the basis of a sale or a distribution, but simply as a matter of book values to the corporation. The precise question was pressed upon the witness as follows:

"Q. But based upon what you have said, is it not your conclusion that to divide the inventory by the number of shares you had would give the value of the stock at $800 a share? A. Under the circumstances, my knowledge of what that consisted, I say no."

Second. The dividends paid. They were certainly large, but then it must be remembered that they were not the result of any patent, but purely of the chances of competition in the open market. The price paid ($400) was par, plus $300 for each share: This enhanced price was naturally due to the large dividends. There is a marked difference between a great corporation, with years of corporate life before it, in the control of a patent, or in possession of a practical monopoly, and a small business, conducted by a family in the form of a corporation, dependent upon the individual efforts of a few persons, and engaged in open competition, with but six years of corporate life before it.

With reference to the contention of the appellants that the value of the stock was $800, as demonstrated by the inventory and dividends, I may cite the language of the court in People ex rel. K. F. Ins. Co. v. Coleman, 107 N. Y. 541, 543, 544, 14 N. E. 431:

"One mode of arriving at the actual value of the capital stock of a corporation is to take what is sometimes called the 'book value,' which is reached by estimating all the assets as they appear upon the corporate books, and deducting all the liabilities and other matters required to be deducted by law, and taking the balance as the measure of value for assessment. This seems to be a proper method for arriving at the value of the capital stock in the case of a corporation which is about to discontinue business, wind up its affairs, and distribute its assets among its shareholders. But it cannot always or usually be a fair or correct method of assessment in the case of a going corporation, whose assets are to remain at the risk of its business."

The appraisal of Surrogate Silkman in Matter of Brandreth's Estate, 28 Misc. Rep. 468, 59 N. Y. Supp. 1092, affirmed 169 N. Y. 437, 62 N. E. 563, 58 L. R. A. 148, may also be noted.

There is a further consideration, which certainly is of some moral weight. The testator knew the business thoroughly; he had grown up in

it and with it daily, and was one of its chief officers. His will, executed in 1883, divided his estate (stock and other property) equally among his children. There was not a great variance between its earnings in 1883 and 1889. He died suddenly in 1889, leaving an unexecuted will. By that will he shifted his scheme of distribution. He did not thereby expressly discriminate as to one child against another, but he gave his shares of stock to his sons exclusively, and the rest of his estate to his daughters exclusively. What was done by subsequent agreement among the legatees was to carry out the scheme of the second but unexecuted will. If the original scheme was equality, there is no indication that for any predilection or prejudice the testator intended to disturb that scheme by his later will. It cannot be said that under the scheme of the second will practical inequality was necessary from the character of his investment in the stock, for the reason that the testator once bequeathed the stock and the other property to all the children, share and share alike. It is not, then, a fair argument that he thought that the division made—i. e., stock to the sons and the other property to the daughters—was practical equality, and that if, on the one hand, the stock, so long as his sons remained in the business and its affairs went well, might perhaps be more profitable, still its value was more uncertain, and more dependent upon the success of the venture than that of the assets of the other part of his estate. He naturally regarded nine children and the children of his dead son. His estate outside of the stock was something over $16,000. If the stock, in the opinion of the testator, was worth $800, as the appellants contend, then by the scheme of his unexecuted will he would have, in effect, left to his three sons $32,000, and but one-half of that sum to his six other children, or have disturbed essentially his original scheme of equality by leaving to each daughter but one-fourth of the amount left to each son. On the other hand, while so marked a difference disturbed any scheme of practical equality, the difference if the stock had been worth $400 would have been no more than might have represented the variance between the value of such corporate stock and that of the other property, which consisted of cash or its certain representative. The comparison is between $16,000 in stock and $17,689 or $16,624 net in cash. My comments may be somewhat fanciful or far fetched, but the disposition of the testator thus analyzed seems to throw some light upon the value of the stock in his judgment. Again, it does not appear that there has ever been any repentance of the bargain by any one save these plaintiffs. The only evidence on this subject is that of the testator's daughter Mrs. Johnson, called by the plaintiffs, who testified: "I stood by the bargain, and have not repudiated it in any way or tried to." In any event, I think that, upon the direct testimony in the case, the finding of the court as to the value of the stock is not "against the weight of evidence, or that the proofs so clearly preponderated in favor of a contrary result that it can be said with a reasonable degree of certainty that the trial court erred in its conslusions." Lowery v. Erskine, 113 N. Y. 52, 55, 20 N. E. 588; Foster v. Bookwalter, 152 N. Y. 166, 46 N. E. 299. It appears, then, that as there was no inadequacy of price therefor, this appeal cannot succeed.

The language of the Court of Appeals in Geyer v. Snyder, 140 N. Y. 394, 400, 35 N. E. 784, is applicable:

"The plaintiff, in the brief of counsel submitted, seems to assume that upon the bare proof of a transaction with the executors, by virtue of which, for an apparently good consideration, her interest in the estate was released or transferred to them, fraud will be presumed, and that the burden is at once cast upon them to show that no undue advantage was taken of her. This position is not supported by any principle of law or rule of equity which we have been able to find. If the beneficiary is competent to contract, the trustee may deal with him without necessarily incurring the suspicion of bad faith. But if he buys an interest in the trust property, or secures from the beneficiary a release to himself, and it is shown that the price was inadequate, or that he has made a profit out of the transaction, the law presumes fraud, or concealment, or undue influence, or some conduct inconsistent with loyalty to his trust, and places upon him the burden of proving that he disclosed to the beneficiary every circumstance relating to the condition of the property which he ought to know in order to form a correct judgment of its value, and that he exerted no undue influence to obtain the assent of the beneficiary to the bargain. It is here that the fatal weakness of plaintiff's case is to be found. She gave no proof of inadequacy of price, or tending to show that the executors had made a large profit out of the property purchased. Had she shown that they obtained property of the estate worth $280,000 for $120,000, as she now alleges, or that for $5,000 she released an interest in the estate which was of the value of $10,000, that fact alone would have given rise to a very strong presumption that she had been defrauded by the executors, from the consequences of which they could not escape, except by the most satisfactory proof that no material information was withheld, and that the sale was her own free, intelligent, and deliberate act."

The only question of law that deserves consideration arises upon the rulings of the court in exclusion of the testimony of a corporation attorney, a broker, and a man engaged in like business, called as experts to answer as to the value of the stock upon hypothetical questions solely. These questions embraced the founding of the business, incorporation, capitalization, kind of business, dividends paid, book inventories, and financial condition. This action is based upon the proposition that the price paid for the stock was inadequate. And the question was, what was the actual value of the stock at the time of the sale? There was no market value. In People ex rel. K. F. Ins. Co. v. Coleman, supra, the court (per Earl, J.), indicates the data for actual value:

"They may take into account the business of the corporation, its property, the value of its actual assets, the amount and nature of its present and contingent liabilities, the amount of its dividends, and the market value of its shares of stock in the hands of individuals. They may resort to any or all of these as to them seems best, and they are not confined to one of them. They may take that test which they think will be most likely to give them the actual value of the stock, and they may disregard all the others. They are not bound to seek for all the evidence which bears upon value; that would be impracticable."

Mr. Sedgwick on Damages (8th Ed., vol. 1, § 257) says:

"Where there is no market value, the value of shares must be found by an examination of the affairs of the company."

Cook on Stockholders (volume 1, § 581) says:

"The real worth of the stock depends upon the value of the property and the business of the corporation."

In Matter of Brandreth's Estate, 28 Misc. Rep. 468, 59 N. Y. Supp. 1092, affirmed 169 N. Y. 437, 62 N. E. 563, Surrogate Silkman took into consideration, as the only manner of arriving at such value, the actual property of the corporation and its earning capacity. When the facts which were germane to the determination of the worth of the stock were put before the court, or, if not all, the other facts were easily ascertainable, I think that the court did not err in excluding the opinion evidence of these experts; for correct inferences from the legitimate data for worth were as easily to be drawn by the court as by experts speaking from hypotheses. In the words of Johnson, C., in Simpkins v. Low, 54 N. Y. 179, 185: "Why should a court be the only place where men most affect an ignorance of what all men know?" When the precise question for the court or jury is the actual value of stock (and market value does not exist, so that expert testimony as to that is not relevant to the question of worth or indicative thereof), and that question depends on the possessions and business of the corporation, and such information is detailed, together with the ordinary data of the number of shares, the corporate life, the character of its business, which of the essential facts cannot be stated or described to the court or jury in such a manner as to enable court or jury to form its judgment, so that expert testimony thereon is necessary?

I cast my question after the rule enunciated in Van Wycklen v. City of Brooklyn, 118 N. Y. 424, 429, 24 N. E. 179, where the court (per Brown, J.), say:

"While it is no longer a valid objection to the expression of an opinion by a witness that it is upon the precise question which the jury are to determine [citing authorities], evidence of that character is only allowed when, from the nature of the case, the facts cannot be stated or described to the jury in such a manner as to enable them to form an accurate judgment thereon, and no better evidence than such opinions is attainable. Ferguson v. Hubbell, 97 N. Y. 507, 49 Am. Rep. 544; Schwander v. Birge, 46 Hun, 66; Greenl. on Ev. vol. 1, § 440, and note. * * * The rule is well stated by Justice Bradley in Schwander v. Birge, supra, as follows: 'The governing rule deduced from the cases permitting the opinion of witnesses is that the subject must be one of science or skill, or one of which observation and experience have given the opportunity and means of knowledge, which exists in reasons rather than descriptive facts, and therefore cannot be intelligently communicated to others, not familiar with the subject, so as to possess them with a full understanding of it.' To the same effect it was said by Judge Earl, in Ferguson v. Hubbell, supra: 'Opinions are allowed when the facts cannot be adequately placed before the jury, so as to impress their minds as they impress the mind of a competent, skilled observer. * * * When the facts can be placed before a jury, and they are of such a nature that juries generally are just as competent to form opinions in reference to them and draw inferences from them as witnesses, there is no occasion to resort to expert or opinion evidence.'"

In Littlejohn v. Shaw, 159 N. Y. 188, 193, 53 N. E. 810, Gray, J., says:

"When the question concerns a matter as to which it may be fairly supposed that jurors are competent to reach a judgment from the exercise of that common knowledge which is attributable to men, the opinions of witnesses are not admissible."

Lawson on Expert and Opinion Evidence says (at pages 483 and 484):

"The opinion of one who has been in the banking business for years, engaged in buying and selling bonds, is competent as to bonds of a kind he has not dealt in, and where he has no special knowledge of their market value. But one is not competent to give an opinion of the corporate value of stock founded on its dividend-earning capacity. One who does not know the value of the plant of a corporation is not qualified to testify as to the value of its stock."

In matter of Brandreth's Estate, supra, Surrogate Silkman, speaking of a corporation somewhat similar, so far as its holdings, the dealings in stock, and its dividends were concerned, said:

"It is at once apparent that it is practically impossible to produce expert evidence of the market value of this particular stock, and the only manner of arriving at its value is by taking into consideration the actual property of the corporation and its earning capacity."

The learned counsel for the appellants cites Sistare v. Olcott, 15 N. Y. St. Rep. 248, and Moffitt v. Hereford, 132 Mo. 513, 34 S. W. 252. Those cases presented the question of the error of admitting the testimony, not rejecting it. Moreover, the question in Sistare v. Olcott, supra, was conversion, and the damages therefor were based upon the market price. Baker v. Drake, 53 N. Y. 211, 13 Am. Rep. 507. In Sistare v. Olcott, supra, there is a dissent by Van Brunt, P. J., upon the admissibility of expert evidence.

I advise that the judgment be affirmed, with costs. All concur; HOOKER, J., in result.