RUBEL, et al., EXECUTORS OF ESTATE OF JACOB H. RUBEL, DECEASED *v.* RUBEL.

No. 39223          October 18, 1954          75 So. 2d 59

850

*W. C. Sweat, Sr.,* Corinth, for appellants.

*Orma R. Smith,* Corinth, for appellee.

APPELLANT IN REPLY.

854

KYLE, J.

This case is before us on appeal by the complainants, Frank R. Rubel and Lotta R. Lehmann, Executors of the will of Jacob H. Rubel, deceased, from a decree of the Chancery Court of Alcorn County dismissing with prejudice their bill of complaint against the defendant, Simon

H. Rubel, wherein the complainants were seeking to recover an alleged balance claimed to be due and owing to them by the defendant on the purchase price of Jacob H. Rubel's interest in the firm of Abe Rubel & Company, a mercantile partnership composed of Jacob H. Rubel, now deceased, and Simon H. Rubel.

Jacob H. Rubel died on January 4, 1946. At the time of his death he and his brother, Simon H. Rubel, were the owners in equal parts of a large mercantile business in the City of Corinth, Mississippi, which was conducted and carried on under the firm name of Abe Rubel & Company. The business had been established by their father, Abe Rubel, during his lifetime. Abe Rubel was the owner of a 60 per cent interest in the business at the time of his death in 1931, and Jacob and Simon were the owners each of a 20 per cent interest in the business. After the death of Abe Rubel, Jacob and Simon acquired the interest of the Abe Rubel estate in the business and continued to operate the same as a partnership until Jacob's death in 1946.

On January 16, 1943, the partners executed written articles of partnership, in which the partners agreed that they would continue to carry on the business, as theretofore, for a term of twenty-five years, sharing equally the gains and losses of the business.

In paragraph 2 of the articles of agreement it was expressly stipulated and agreed as follows:

"2. That the partnership's capital shall be all the assets of the said business of Abe Rubel & Co. as of the date of this agreement, it being understood and agreed that this agreement is not to affect in any way the business now being conducted by the parties hereto under their oral partnership agreement; but said business is to be conducted as heretofore as this agreement is not to have any effect whatever upon the character and conduct of the said business."

Paragraphs 4 and 5 of the Articles of Partnership were as follows:

"4. It is agreed and understood by and between the parties hereto that the death of either party to this agreement shall not work a dissolution of this partnership.

"5. If, upon the death of either party to this agreement, the other should wish to purchase his deceased partner's interest in the said partnership, he shall have the right to do so, and the price of said interest is hereby fixed at seventy-five (75%) per cent. of the book value thereof. Not only is this price deemed to be fair and equitable, but it is in line with a custom followed by members of all the old partnerships conducted under said partnership name over a period of many years."

On January 1, 1943, Jacob H. Rubel executed his last will and testament, and in paragraph 15 thereof the testator expressly provided as follows:

"15. The firm of Abe Rubel & Company, a mercantile partnership, located in the City of Corinth, Alcorn County, Mississippi, shall have six years from and after my death, if they so desire, in which to liquidate my interest in said partnership, provided the said firm will amortize my said interest, paying one-sixth (1/6) thereof each year to my executors and trustees, the first payment to be made upon receipt of firm insurance on my life. Abe Rubel & Company is to pay no interest upon the unamortized amount to my executors and trustees.

"My executors and trustees are expressly authorized, empowered and directed to carry into effect the provisions of this section of my will when and as soon as said firm indicated to them its desire to take advantage of the proposed scheme, and shall deliver to them a satisfactory statement of my interest in the said firm. In the event the said firm does not wish to take advantage of the amortization plan here proposed, or should fail and refuse to carry it into effect as herein provided, then and

in either event my executors and trustees shall thereupon take such steps to protect the interests of my estate as to them seem wise and prudent.''

After Jake Rubel's death Simon notified the executors that he desired to purchase the interest of the deceased in the firm of Abe Rubel & Company and to amortize the purchase price over a period of six years as provided for in paragraph 15 of Jake's will; and Simon thereafter continued to operate the business as his own. On February 27, 1946, Simon, as surviving partner, collected the proceeds of a life insurance policy in the sum of $50,000, which was carried by the firm on Jake Rubel's life, and paid the same over to the executors to be credited upon the purchase price which Simon was to pay for Jake's interest in the firm. Simon made other payments to the executors during the year which were to be credited upon the purchase price of Jake's interest in the firm. But the parties were unable to agree upon the amount which Simon should be required to pay for that interest; and on April 26, 1949, the executors filed their bill of complaint in this cause for the purpose of having the court determine the value of Jake's interest in the firm and the balance to be paid by Simon for that interest.

The complainants alleged in their bill that the defendant had notified them soon after Jake's death of his desire to purchase the interest of the deceased partner in the firm and to take advantage of the provisions of the will relating to the payment of the purchase price, but that the defendant had never furnished them a satisfactory statement of the assets of the firm as required by the will; that the defendant claimed that he was entitled to purchase the interest of the deceased at 75 per cent of its book value under the terms of the partnership agreement; and that the defendant had indicated to the complainants that the amount that he should be required to pay for the interest of the deceased partner was $107,026.73. The complainants further alleged that the actual

value of Jake's interest in the firm at the time of his death was far more than the above stated amount even at a twenty-five per cent discount; that the firm carried life insurance policies in the sum of $50,000 on the life of each of the partners, which were payable to the firm, and that the defendant had collected the proceeds of the policy payable on the death of Jake Rubel and had claimed the entire proceeds as his own and had turned the check over to the complainants to be credited on the purchase price of Jake's interest in the firm; that the firm also owned office and store furniture and fixtures and delivery equipment of the value of $25,000, which the defendant had not taken into account in determining the value of Jake's interest in the firm; that the real estate and merchandise owned by the partnership were carried on the books at much less than their actual value; and that the actual value, and not the book value, of all of the above mentioned assets should be used in determining the value of the deceased partner's interest in the firm. The complainants asked that the defendant be required to produce in court the books and records of the partnership, including the life insurance policy carried by the firm on the defendant's own life, so as to show the financial condition of the firm at the time of Jake Rubel's death, and that the court determine the value of Jake Rubel's interest in the firm at the time of his death and enter a decree in favor of the complainants for the amount found to be due as the unpaid balance of the purchase price of that interest, and that the Court affix a lien upon the assets of the partnership in the hands of the defendant to secure the payment of such balance.

The defendant in his answer admitted that the firm of Abe Rubel & Company carried life insurance in the sum of $50,000 on the life of each of the partners, and that the proceeds of the policies were payable to the firm; but the defendant averred that the life insurance policies were not carried as assets on the books of the

firm, and that neither the proceeds collected by him on the policy payable on the death of Jake Rubel nor the cash surrender value of the policy carried by the firm on his own life should be taken into account in determining the value of Jake Rubel's interest in the firm. The defendant also averred that the office and store furniture and fixtures and the delivery equipment referred to in the bill of complaint had been fully depreciated and charged off prior to Jake Rubel's death and had no book value at the time of his death and that none of said equipment should be taken into account in determining the value of Jake Rubel's interest in the firm. The defendant denied that the real estate owned by the firm was carried on the books at a value much less than its actual value, or that the merchandise on hand December 31, 1945, was worth more than the inventory valuation shown on the balance sheet.

The defendant averred in his answer that the book value of Jake Rubel's interest in the firm at the time of his death as shown by his investment account on the partnership books, was $162,861.02, and that 75 per cent of that amount was $122,145.77, which represented the full amount of purchase price that he should be required to pay for the deceased partner's interest.

The defendant alleged in his answer that he had paid $82,889.63 of the above mentioned purchase price; that since the death of Jake Rubel errors had been discovered in the accounts of Jacob H. Rubel and Simon H. Rubel, executors of the Abe Rubel estate, and that certain items of income belonging to the Abe Rubel estate had been credited to the partnership, for which Jake Rubel and the defendant were liable to the Abe Rubel estate; that the defendant had accounted to the estate for those items amounting to $22,064.94; and that the defendant was entitled to a credit of $11,032.74 on account of said payments. The defendant admitted that there remained an

unpaid balance of $28,223.40 still owing by him to the complainants on the purchase price of Jake Rubel's interest in the partnership; but the defendant averred that a suit was pending against him and Jake Rubel, deceased, as executors of the Abe Rubel estate, in which the devisees and legatees of the Abe Rubel estate were demanding other large sums of money, and there might be other offsets due the defendant against the above mentioned balance still owing by him to the complainants.

After the filing of the above mentioned answer, no further action was taken in the case until June 11, 1952, when the complainants filed an amendment to their original bill, in which they averred that the six years allowed in paragraph 15 of Jake Rubel's will for the payment of the purchase price of Jake Rubel's interest in the firm had expired, and the complainants demanded interest on the installments still remaining unpaid. The defendant then withdrew his original answer and filed an amended answer, in which he reaffirmed the defenses set up in his original answer and set forth his claims for credits with more clarity and accuracy. The defendant alleged in his amended answer that the unpaid balance still due and owing by him to the complainants was $28,002.35, which he offered to pay into court; and the defendant made his answer a cross bill and asked that the complainants and cross defendants be required to execute and deliver to him such instruments of writing as might be necessary to convey to him the Jacob H. Rubel interest in the firm assets on payment to them of the said sum of $28,002.35.

The defendant attached to his answer a copy of the balance sheet of the firm as of January 4, 1946, in which

the assets and the liabilities and net worth of the partnership were summarized as follows:

## ASSETS

| | |
|---|---:|
| Cash on hand and in banks | $129,920.94 |
| Accounts receivable | 21,928.57 |
| Notes receivable | 31,500.00 |
| Inventory of merchandise | 33,897.17 |
| Real estate | 27,858.22 |
| Stocks and bonds | 72,087.33 |
| Amounts due from heirs of Abe Rubel's estate | 14,336.64 |
| **TOTAL ASSETS** | **$331,528.87** |

## LIABILITIES

| | |
|---|---:|
| Due to the heirs of Abe Rubel Estate | $ 53,258.42 |
| Net Worth—Partnership: | |
| Investment, J. H. Rubel, January 4, 1946 | 162,861.02 |
| Investment, S. H. Rubel, January 4, 1946 | 115,409.43 |
| **TOTAL LIABILITIES AND NET WORTH** | **$331,528.87** |

Separate schedules of the notes receivable, real estate owned by the partnership, and stocks and bonds, aggregating the several amounts shown above, were attached to the balance sheet.

The case was tried at the December 1952 term of the court. Before the trial was begun the defendant paid into court the above mentioned sum of $28,002.35, which he admitted that he still owed; and during the progress of the trial the defendant paid into court the additional sum of $1,631.00, making a total of $29,633.35. After hearing the testimony, the chancellor held that the partnership contract was a valid and enforceable contract,

and that Simon had a right to purchase Jake's interest in the firm of Abe Rubel & Company at a price equal to 75 per cent of its book value, as provided for in the contract, and to pay for the same in six annual installments, as provided for in Jake's will. The chancellor held that the words "book value," as used in paragraph 5 of the partnership agreement, meant the investment account, and that the appellee was entitled to purchase Jake's interest at 75 per cent of its value as reflected in Jake's investment account without regard to the actual value of the partnership assets. The chancellor held that, in view of the fact that the $50,000 insurance policy on Jake's life which was payable to the firm was not set up on the books as an asset, Simon was not required to add the same to the book value of the assets at the time he elected to purchase Jake's interest in the firm; and for the same reason Simon was not required to add to the book value of the assets the cash surrender value of the insurance policy carried by the firm on his own life. And the chancellor entered a decree dismissing with prejudice the bill of complaint filed by the executors and granting the relief prayed for in the defendant's cross bill.

The first point argued by the appellants' attorneys as ground for reversal of the decree of the lower court is that the court erred in holding that the appellee was entitled to purchase Jacob H. Rubel's interest in the firm of Abe Rubel & Company at a price equal to 75 per cent of its book value, as provided in paragraph 5 of the partnership agreement, and to pay for the same in six equal installments without interest, as provided in the will. But we think that there is no merit in this contention. The partnership agreement expressly provided that the surviving partner should have the right to purchase the deceased partner's interest in the firm at a price equal to 75 per cent of its book value. Jacob H. Rubel had executed his will a few days before the partnership agreement was signed; and in his will the testa-

tor had expressly directed that the firm should be permitted to amortize the purchase price of his interest over a period of six years, provided the firm should pay a one-sixth part of the purchase price each year. The first payment was to be made upon receipt of the firm insurance on the testator's life, and no interest was to be exacted by the executors upon the deferred installments. The language used in the will is clear. The testator, if he saw fit to do so, had a right to provide in his will that the surviving partner should not be required to pay interest on the deferred installments; and there is nothing in the contract agreement, which was executed a few days later, that would prevent the surviving partner from claiming the benefit of the provisions of the will permitting him to pay for the deceased partner's interest in installments without interest.

The next point argued by the appellants' attorneys is that the court erred in holding that the term "book value," as used in the partnership agreement, meant the investment account of Jake Rubel, as shown on the balance sheet as of the date of his death. The appellants contend that the words "book value" should be construed to mean the actual market value of all the assets of the firm at the time of Jake Rubel's death, less the liabilities of the firm at that time. To this contention the appellee makes the simple answer, that "book value" means what it says—value as shown on the books.

The appellants alleged and the proof tended to show that the real estate owned by the partnership at the time of Jake Rubel's death was carried on the books at a total valuation that was much less than its market value. But the stocks and bonds owned by the partnership (not including, however, the Corinth Brick Company stock owned by the partnership) were sold soon after Jake Rubel's death at a loss of $8,602.93. The notes receivable consisted of notes of the Corinth Brick Company in the sum of $31,500. Of that amount $11,100 was secured

by a mortgage deed of trust on the brick company's plant. The remaining notes were unsecured and of doubtful value at the time of Jake's death; but all of the notes had been paid at the time of the trial. The office and store furniture and fixtures and the delivery equipment (including automobiles and trucks) had been listed as assets on the ledger, but had been depreciated and charged off and were not shown on the balance sheet. The insurance policies on the lives of the partners were not shown as assets on the ledger or the balance sheet.

We think that the chancellor was correct in holding that the book value of all of the above mentioned assets which were shown on the general ledger and the balance sheet should be accepted in determining the book value of Jake's interest in the firm at the time of his death. We also think that the chancellor was justified in refusing to undertake to revalue the office and store furniture and fixtures and the delivery equipment, which had been in use for many years and had been depreciated on the general ledger and charged off prior to Jake's death.

But we think that the chancellor was in error in holding that the insurance policies on the lives of the partners should be excluded in determining the book value of Jake's interest in the firm.

The price which Simon was required to pay for Jake's interest in the firm under the terms of the partnership agreement was 75 per cent of the book value of that interest. When Simon elected to purchase Jake's interest in the firm after Jake's death, it was his duty and the duty of Jake's executors to determine the book value of that interest; and such value could be determined properly only by a full examination of the books of the company, not by a mere inspection of the balance sheet, and under the facts in this case not by a mere inspection of the general ledger. The insurance policies had not been entered upon the general ledger. But the policies were in

the possession of the partnership; they were payable to the partnership; and the books of account showed that the premiums had been paid by the partnership out of the partnership funds. The fact that the policies were not listed on the general ledger and that their cash surrender value was not shown as a part of the invested capital of the partners was not sufficient in our opinion to justify the appellee's claim that the policies should not be taken into account in determining the book value of Jake's interest in the firm.

The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. 17 C. J. S., p. 689, Contracts, par. 295 a; U. S. Fidelity & Guaranty Co. v. Parsons et al., 154 Miss. 587, 122 So. 544; Grissom v. Livingston et al., 213 Miss. 424, 57 So. 2d 144; and in the case of Copiah Hardware Co. v. Johnson, 123 Miss. 624, 86 So. 369, this Court said that "the intention of the parties must be collected from the whole agreement, and every word therein must be given effect, if possible, and be made to operate according to the intention of the parties." It is also well settled that the words of a contract should be given a reasonable construction, where that is possible, rather than an unreasonable one; and the court should likewise endeavor to give a construction most equitable to the parties, and one which will not give one of them an unfair or unreasonable advantage over the other. 17 C. J. S. 739, Contracts, par. 319; Citizens' Bank v. Frazier, 157 Miss. 298, 127 So. 716. "Constructions of contracts which would make them unfair and unjust are to be avoided, unless the terms are unambiguous and express." McCain et al. v. Lamar Life Ins. Co. (Miss.), 172 So. 495.

The partnership agreement was executed approximately three years before Jake's death. If the partners had intended that the insurance policies should become

the individual property of the survivor upon the death of the member dying first, there is no reason why such intention should not have been expressed in the partnership agreement. But we find no such intention expressed in the partnership agreement or in Jake's will, which was executed about the same time. The insurance policies were payable to Abe Rubel & Company, and nothing was said in the partnership agreement about the policies becoming the individual property of the survivor upon the death of the member dying first. The partnership agreement expressly provided that the partnership capital should consist of all the assets of the partnership as of that date; and it is admitted that the insurance policies constituted assets of the partnership. Jake's will provided that the firm of Abe Rubel & Company should have six years in which to liquidate his interest in the partnership, ''provided the said firm will amortize my said interest, paying one-sixth (1/6) thereof each year to my executors and trustees, the first payment to be made upon receipt of firm insurance on my life.'' The executors and trustees were authorized to carry into effect the above mentioned provisions of the will, ''when and as soon as said firm indicates to them its desire to take advantage of the proposed scheme, and shall deliver to them a satisfactory statement of my interest in said firm.'' Nothing is said in the partnership agreement or in the will that would justify us in holding that the insurance policies should be excluded in determining the book value of Jake's interest in the firm.

The appellee's attorney strongly contends, however, that the term ''book value,'' as used in the partnership agreement in referring to the value of the deceased partner's interest in the firm, meant the deceased partner's investment account, as shown on the general ledger. But this contention finds no support in the partnership agreement or the will. The investment accounts of the partners are not mentioned in the partnership agreement;

and nothing is said in Jake's will about the testator's investment account.

"Book value" is defined in Webster's New International Dictionary, Second Edition, p. 309, as "The value of anything shown by the books of account of the business owning it; specif. of stock, the value as indicated by the excess of assets over liabilities." In Black's Law Dictionary, Third Edition, p. 238, the term "book value" is defined as "The value of the stock as shown by the assets and liabilities as carried on the books. Lane v. Barnard, 173 N. Y. S. 714, 716, 185 App. Div. 754." In the case of In Re Reben's Will (1952), 115 N. Y. S. 2d 228, 237, the Court said: " * * * the 'book value' of the stock of a corporation is determined ordinarily by ascertaining the value of all the assets of the corporation as shown on its books and deducting therefrom all of its liabilities." In the case of Early v. Moor (1924), 249 Mass. 223, 144 N. E. 108, 33 A. L. R. 362, the agreement provided for the sale of the stock of a corporation for its fair book value, and the Court in its opinion said: "It is manifest that under the agreement 'fair book value' of the stock of the deceased, is to be arrived at by ascertaining the value or net worth of all the assets and deducting therefrom the liabilities."

In the case of Elhard v. Rott, 36 N. D. 221, 162 N. W. 302, which is cited with approval in Early v. Moor, supra, the Court had under consideration the meaning of the term "book value," as used in a contract for the sale of bank stock, and in its opinion the Court said: " 'Book value' has an established meaning in so far as the capital stock of a banking corporation is concerned. It means value as predicated on the face value of the assets of the corporation after deducting its liabilities. Steeg v. Leopold Bldg. & Imp. Co., 126 La. 101, 52 So. 232-235; Cabble v. Cabble, 111 App. Div. 426, 97 N. Y. Supp. 773-775; 1 Words and Phrases (Second Series) 479. The assets, of course, must appear upon the books of the company, and

must be able to be estimated therefrom, but it does not follow that the computation must have been made on such books and appear on the ledger. The book value of stock is determined by the face value of the assets as they appear upon the books. The bills receivable of every bank contain not merely the record of the notes and of the face value of the principle thereof, but of the interest which they draw and the dates of their making and maturity."

In Corbett v. McClintic-Marshall Corporation (1930), 17 Del. Ch. 165, 151 A. 218, the Court had under consideration the meaning of the words "book value," as used in the preferred stock clause of the certificate of incorporation of the defendant corporation, wherein the company reserved the right any time to redeem the whole or any part of the preferred stock upon the payment of one hundred dollars ($100) per share, "provided that if the book value of the stock, as shown by the last annual statement of assets and liabilities of the company submitted to and approved by the board of directors, shall exceed **one hundred dollars ($100) per share, the company shall** pay therefor the said book value of said stock instead of said amount of one hundred dollars ($100) per share." The chancellor, in seeking to define the meaning of the words "book value" as used in the charter said: "The contract refers to a document from which book value is to be ascertained * * *. I take it that the word 'book' in book value indicates that the statement is to reflect the condition of the company's books. It would appear entirely reasonable to thus allow the word book to transfer some of its modifying meaning to the statement of assets and liabilities, for when such language as this is used I think the common understanding of men is that what is meant is a value disclosed by a statement that reveals the money measure of assets and liabilities as they are shown on the books of the company. So that we come to a source back of the statement, viz., to the

books, for an ascertainment of the items and figures from which book value is ultimately derived.''

In the case of Hagan v. Dundore (1947), 187 Md. 430, 50 A. 2d 570, the partnership agreement gave Dundore, the active partner, an option to purchase Hagan's interest in the partnership for a sum not exceeding the book value of that interest. The chancellor, in computing the amount to which Hagan became entitled on Dundore's exercise of his right to purchase Hagan's interest, accepted the book valuation of the partnership's tangible assets, which did not include the earned proportion of expenses and profits on outstanding contracts, nor did it include the true value of assets specifically amortized for income tax purposes. The appellee contended that such a method was required by the agreement, which called for the purchase of the inactive partner's interest at ''book value'' and excepted good will. But the court of appeals reversed the decree of the chancellor and in its opinion said: ''We think the appellant is entitled, under the agreement, to have all proper elements of value, exclusive of good will, that can be determined by audit from all the books and records, included in the computation of book value.''

In Jennemann v. Bucher, 186 Mo. App. 179, 188, 171 S. W. 613, the Court held that where, in an action by one of the two stockholders of a corporation, who bought out the shares of the other, to recover an overpayment to the seller due to a mistake in adding the whole of the outstanding assets to the half share of the seller, the petition alleged that the stock was sold at its book value, the Court held that a valuation on the invoice value should be considered its ''book value,'' no other value being given, whether formally carried on the books of the concern or not.

■■■ ''Book value,'' as the term is used in referring to the value of the deceased partner's interest in the case that we have here, in our opinion means the money value

of that interest arrived at by taking the total value of the assets of the partnership, as shown on the general ledger and other books of account, and deducting therefrom the total liabilities of the partnership. The term "book value," when used in referring to the value of a partner's interest in the firm, presupposes the existence of a proper set of books showing such assets and liabilities. ██ In computing the book value of a deceased partner's interest the book value of the assets shown on the general ledger should ordinarily be accepted in determining the book value of the partnership assets. But, if it should appear from the records and other books of account of the partnership that there are other assets which have been omitted from the general ledger, such assets should not for that reason alone be excluded from the computation; but such assets should be added to the assets shown on the general ledger and their value ascertained from such records as may be available, to the end that all proper elements of value may be included in the computation.

██ We do not think that it was the intention of the parties in the case that we have here to treat the insurance policies as assets having no book value. The policies were kept in force by the partners from year to year for the benefit of the partnership; and this fact was established by the book entries showing the payment of the annual premiums. The premiums paid for the year 1945 amounted to approximately $3,000. The policies themselves showed the face amount of the insurance coverage and the cash surrender value of each of the policies from year to year. The policy on Jake's life was a matured asset at the time Simon elected to purchase Jake's interest in the firm; and the policy on Simon's life had a cash surrender value of $21,468.25. If these valuable assets were not shown on the ledger and the balance sheet when Jake died, it was the duty of the surviving partner to enter them on the ledger and the balance sheet, so that

they might be taken into account in determining the value of Jake's interest in the firm.

The amount collected by the firm on the insurance policy on Jake's life was $50,119.50. The cash surrender value of the policy on Simon's life, as stated above, was $21,468.25. These items should have been taken into account in computing the book value of Jake's interest in the firm. If they had been included, the value of that interest would have been $198,654.89, instead of $162,-861.02, as averred in Simon's answer to the bill of complaint and as stated in the chancellor's decree. Simon had a right to purchase that interest at 75 per cent of its book value, which amounted to $148,991.17. After allowing proper credits for the payments made, including the two payments of $28,002.35 and $1,631.00, aggregating the sum of $29,633.35, paid into the registry of the court during the month of December 1952 there still remained unpaid at the time the hearing was concluded the sum of $26,845.40; and the appellants were entitled to a decree for that amount, with interest thereon from the time it became due and payable at the rate of six per cent per annum.

Simon had elected to pay the purchase price in six equal annual installments, without interest, as provided in paragraph 15 of Jake's will, the first payment to be made upon receipt of firm insurance on Jake's life. The record shows that Simon received the proceeds of the firm's insurance on Jake's life on February 27, 1946. A one-sixth part of the purchase price which Simon was to pay for Jake's interest in the firm became due and payable at that time, and one such equal installment became due and payable on February 27 of each succeeding year, until February 27, 1951, when the last installment became due and payable.

Finally, it is contended on behalf of the appellants that the chancellor erred in refusing to allow interest after maturity on the $29,633.35, which the appellee

admitted that he owed and finally paid into court during the month of December 1952.

We think that the chancellor erred in refusing to allow interest on that amount from the time it became due and payable until the date of payment into the registry of the court.

Section 36, Code of 1942, provides that, "The legal rate of interest on all notes, accounts and contracts shall be six per cent per annum; but contracts may be made, in writing, for a payment of a rate of interest as great as eight per centum per annum."

In the case of Stowell et al. v. Clark, 152 Miss. 32, 118 So. 370, the Court, in construing the above mentioned statute, said: "The statute means that the rate of interest on accounts and contracts shall be six per cent per annum where there is no agreement between the parties as to interest. The amount due under an account or contract bears six per cent interest from the time it is due and payable, unless it is otherwise provided by agreement of the parties."

In the case of United Press Associations v. McComb Broadcasting Corporation, 201 Miss. 68, 28 So. 2d 575, the Court held that a news association which recovered the sum of $1,137.85, the balance alleged to be due under a contract to furnish the broadcasting station news reports, was entitled to have added legal interest thereon, computed from the date of the breach of the contract to the date of the decree. In the case of Trinidad Asphalt Mfg. Co. v. Gregory, 166 F. 2d 745, the Court held that under the Mississippi law the plaintiffs were entitled to interest from the date that money sued for became due and the defendants could not complain of the allowance of interest from the date from which the plaintiffs claimed interest where that date was subsequent to the date the money became due.

It is argued on behalf of the appellee, however, that the amount of the unpaid balance of the purchase

price which the appellee was to pay for the deceased partner's interest in the firm was in dispute, and that the appellants were not entitled to recover interest on the unpaid balance of the purchase price until the amount of that balance had been judicially ascertained. But the rule is that, "The pendency of litigation between the parties to an existing debt concerning it will not of itself suspend the running of interest on such debt during such litigation, where the money is not paid into court." 47 C. J. S. 67, Interest, par. 55. See Johnson v. Crawford & Yothers, C. C. Pa., 144 F. 905. See also United Press Association v. McComb Broadcasting Corporation, supra, and Trinidad Asphalt Mfg. Co. v. Gregory, supra.

It is also contended on behalf of the appellee that interest should not be allowed on the balance which remained unpaid at the end of the six-year period, because Simon and Jake's administrator were being sued for large sums of money alleged to be due and owing by them to the legatees of the estate of Jake Rubel, deceased, and that Simon might have become entitled to additional setoffs as a result of additional payments which he might have been required to make to the legatees of the Abe Rubel estate in that case. But, the rule seems to be well-settled that where the amount of the demand is sufficiently certain to justify the allowance of interest thereon, the existence of a setoff, counterclaim or cross-claim which is unliquidated will not prevent the recovery of interest on the balance of the demand found due from the time it became due. 47 C. J. S., p. 31, Interest, par. 19 b.

It can be readily seen that the question of the defendants' liability for interest in a case of this kind is entirely different from the question of personal liability of executors and administrators for interest on funds belonging to the estate of a decedent where there has been a delay in closing and settling the estate, as in the companion case of Mrs. Stella Schwander et al. v. Simon H. Rubel et al., No. 39,224, this day decided. It may be

readily conceded that the appellee in this case was acting in the utmost good faith when he contended in his answer that the insurance policies on the lives of the partners should not be taken into account in determining the book value of Jake's interest in the firm, because the policies had never been carried as assets on the general ledger. But where the suit is a suit to enforce the obligations of a contract for the payment of money, as in this case, the right of the complainant to recover interest is fixed by the statute. Interest in a case of this kind is not imposed as a penalty for wrongdoing; it is allowed as compensation for the detention of money overdue. Miller, State Revenue Agent v. Henry, Insurance Commissioner, 139 Miss. 651, 103 So. 203.

The decree of the lower court dismissing the bill of complaint filed by the appellants is therefore reversed and the cause is remanded with instructions that a decree be entered in favor of the appellants for the above stated sum of $26,845.40, being the unpaid balance of the purchase price due and owing by the appellee to the appellants for Jake Rubel's interest in the firm of Abe Rubel & Company, and interest thereon at the rate of six per cent per annum from the date said sum became due under the terms of paragraph 15 of Jake Rubel's will to the date of the rendition of such decree, and also interest on the above stated sum of $29,633.35 from the date said sum became due to the date of the payment of same into the registry of the court.

Paragraphs (b) and (c) of the decree, which provide for the cancellation of the cross-defendants' claim against the partnership assets and the execution and delivery by the cross-defendants to the cross-complainant of such bills of sale, deeds, or conveyances as may be necessary to vest in him legal title to the deceased partner's interest in the partnership and partnership assets, and paragraph (e) of the decree which provides for the cancellation of the lis pendens notice, are modified so as

to make such cancellation of the cross-defendants' claim against the partnership assets effective, and so as to require the execution of such bills of sale, deeds or conveyances by the cross-defendants to the cross-complainant, only upon the receipt by the cross-defendants of the above mentioned balance of the purchase price with interest as stated above; and the cancellation of the lis pendens notice shall not become effective until the payment of said balance to the cross-defendants as provided for above; and, as thus modified, the above mentioned paragraphs of the decree are affirmed. That part of the decree directing the clerk to pay over to the complainants the above mentioned sum of $29,633.35 deposited with him by the defendant in December 1952 is affirmed. That part of the decree taxing the costs incurred in the court below against the cross-defendants is reversed; and the chancellor shall retax the costs in such manner as he may deem equitable and just. The costs on this appeal shall be taxed against the appellee.

Reversed in part, affirmed in part, and remanded.

*McGehee, C. J.,* and *Hall, Holmes* and *Gillespie, JJ.,* concur.