Jesse M. CHAFFE, Jr., et al., Appellants,

v.

Sid MURRAY et al., Appellees.

No. 723.

Court of Civil Appeals of Texas, Corpus Christi.

March 22, 1973.

Rehearing Denied April 12, 1973.

Garrett & Letbetter, George Payne, Houston, for appellants.

Wood, Burney, Nesbitt & Ryan, Allen Wood, Corpus Christi, for appellees.

## OPINION

BISSETT, Justice.

This is a suit on a limited partnership contract. The basic issue is the meaning

of the term "book value" as used in the contract on which the suit is based. Jesse M. Chaffe, Jr. and wife Jean Chaffe, Lee M. Gallagher and wife, Kathleen Gallagher, and Larry Folks and wife, Catherine Folks, plaintiffs-appellants, who were limited partners in the Sid Murray Insurance Agency, sued Pat Murray Trust II, Mike Murray Trust II, Sid Murray, (and others), defendants-appellees, who were general partners in the Agency, to recover the book value of their partnership interest in the Agency.

After plaintiffs had rested, the trial court withdrew the case from the jury and entered judgment that plaintiffs Jesse M. Chaffe, Jr. and wife, Jean Chaffe, recover of and from Pat Murray Trust II the sum of $10,000.00; that plaintiffs Lee M. Gallagher and wife, Kathleen Gallagher, recover of and from Mike Murray Trust II the sum of $10,000.00; and, that plaintiffs Larry Folks and wife, Catherine Folks, recover of and from Pat Murray Trust II the sum of $4,000.00. Plaintiffs have appealed. We affirm.

The undisputed evidence showed that Articles of Limited Partnership were executed on July 1, 1959, whereby Sid Murray and his wife became general partners, and plaintiffs (and others) became limited partners in a partnership known as Sid Murray Insurance Agency. The Articles were amended and supplemented by written instrument, dated July 1, 1965. Chaffe and Gallagher each owned 5% of the partnership; each made a capital contribution of $5,000.00. Folks owned a 2% interest therein, based on his capital contribution thereto of $2,000.00. Total capital contributions of all partners amounted to $100,000.00.

Section C, Article XXIII, of the 1965 Articles granted Pat Murray Trust II and Mike Murray Trust II the right to acquire the interest of any limited partner upon termination of his interest in the partnership by paying him (insofar as this appeal is concerned) "Book value at the end of the preceding fiscal year, after distribution of profits for such year, plus 100%."

Plaintiffs' interests in the partnership terminated in the early part of 1970. Pat Murray Trust II offered to purchase Chaffe's interest for $10,000.00, and offered to purchase Folks' interest for $4,000.00. Mike Murray Trust II offered to purchase Gallagher's interest for $10,000.00. All such offers were rejected by plaintiffs.

The writing evidencing the provision of the contract that is relied on is set out verbatim in plaintiffs' petition. They further allege that "the reasonable value of said partnership, less its liabilities, is $3,000,000.-00, . . ." Plaintiffs contend that the words "book value" as used in the contracts meant the true value of the Agency, and that the term "true value" is synonymous with actual value, market value or selling price of the Agency. On the other hand, defendants take the position that the term "book value" meant the value shown by the books of the business as kept by the Agency, as distinguished from other types of value.

An unaudited financial statement of the Agency for the year 1969 was introduced into evidence without objection. It consisted of a balance sheet that showed assets, liabilities and capital, together with supporting schedules. Exclusive of net earnings due the partners for 1969, the difference between the assets and liabilities was shown by the statement to be $100,000.00.

The trial court excluded most of the evidence that was offered by plaintiffs. All of such excluded evidence appears in the record by Bills of Exception. According to Gallagher, a 1957 profit sharing arrangement had been set up in which he and Chaffe had participated; plaintiffs' proffered Exhibit No. 2, a letter dated November 11, 1957, was written by Sid Murray to plaintiffs whereby Murray stated that the Agency was then worth from $300,000.00 to $500,000.00, and that "if we

increase the business in the next ten years as we should, the Agency should be worth $1,000,000.00, so you see 1% of the Agency would be worth $10,000.00; 5% would be worth $50,000.00". Gallagher related the letter back to the 1959 contract. Other letters, all dated subsequent to the 1959 contract, were offered. According to Chaffe, he stood to make less money under the partnership than under his employment agreement with Sid Murray as that agreement existed in July, 1959, but Murray assured him that his (Chaffe's) ownership in the growth of the business would offset that lack of present income over the years. As of December 31, 1969, the Agency had in card media a card for each of the 50,000 policies of insurance which were then in force on the books of the Agency. On each card appeared the insured's name, the annual premium, the billable premium, and a code for the commission on the premium when it was paid. All of the plaintiffs, in their Bills of Exception, testified that the physical records pertaining to the renewals and expirations, including the cards, were part of the partnership's books of account; that the renewals and expirations and their records constituted the most valuable assets of the Agency; and that the Agency was worth $3,000,000.00 on December 31, 1969. They further said that they understood that "book value" in the contracts meant "market value".

Plaintiffs also called George W. Lafferty, a certified public accountant, as an expert witness. He was not permitted to testify. He stated on Bill of Exception that financial statements do not generally reflect the current value of the assets of a business; that the term "book value" as used in a written instrument depends primarily on the intent of the contracting parties rather than on an accounting definition of the term; and that the records kept by the Sid Murray Agency on renewals and expirations of policies of insurance were accounting records of the Agency. He agreed, however, that the term "book value" meant the difference between the assets as recorded in accordance with generally accepted accounting principles applicable and current liabilities as recorded in accordance with accepted accounting principles.

The letters and all of the foregoing testimony from plaintiffs and Lafferty were offered into evidence, objections to which were sustained by the trial court. Plaintiffs complain of the action by the court in numerous points of error.

After plaintiffs rested, defendants, without putting on any evidence, moved for an instructed verdict on the ground that a recovery based on market value is not justified by the contracts and the evidence, and on the further ground that the pleadings and evidence did not authorize any judgment against defendants except for the amounts of money tendered by them to plaintiffs, which sums of money constituted "book value" of plaintiffs' interest in the partnership, plus 100%. Their motion was granted and judgment on that basis was rendered.

The term "book value" is not defined in either the 1959 or 1965 contracts. As far as we have been able to determine, the Texas Courts have not passed upon the question of what is "book value" of a business. Wineinger v. Kay, 58 S.W.2d 876 (Tex.Civ.App.—Amarillo 1933, n. w. h.), cited by plaintiffs, does not define "book value" as being the value predicated upon the market value of the assets after deducting liabilities as plaintiffs contend. There, the appellate court merely noted that there are authorities that support the definition of the term, which was given in the charge. However, no one objected to the charge or the definition contained therein. The Court of Civil Appeals carefully observed that the parties to the suit impliedly agreed in the trial court to the definition of the term as set out in the charge. The Court held that there was no evidence to support the book value of the stock as found by the jury, where the only evidence of book value thereof was a fi-

nancial statement that reflected only the prices paid for the items shown thereon without regard to their actual value.

The term "book value" is unambiguous and is susceptible of only one construction. It is the value shown by the books of the business and no other value. It means the value that is arrived at by taking the total value of the assets as shown by its books and deducting therefrom the total liabilities. Cates v. Cates, 217 Ga. 626, 124 S.E. 2d 375 (1962); Succession of Jurisich, 224 La. 325, 69 So.2d 361 (1953); Bailey v. Smith, 268 Ala. 456, 107 So.2d 868 (1959); Rubel v. Rubel, 221 Miss. 848, 75 So.2d 59, 47 A.L.R.2d 1410 (1954); Chadwick v. Cross, Abbott Company, 124 Vt. 325, 205 A.2d 416 (1964); Schunk v. Thickman, 436 P.2d 542 (Wyo.Sup.1968); Hagan v. Dundore, 187 Md. 430, 50 A.2d 570 (1947); Lane v. Barnard, 185 App.Div. 745, 173 N.Y.S. 714 (1919).

The books of a business presupposes the existence of a correct, complete and proper set of books that shows all of its assets and liabilities. A proper set of books is a set that is kept either in compliance with the accounting procedures that are spelled out in the agreement of the parties; or, as may be subsequently agreed to by the parties; or, in the absence of any such agreement, as may be prescribed by generally accepted accounting and bookkeeping principles.

■ The burden was on plaintiffs to prove the "book value" of the partnership by introducing evidence of the value of all assets thereof and deducting all liabilities therefrom, as reflected by its books. Counsel, in offering the records of renewals and expirations and their value into evidence, advised the trial court:

"And we offer this, Your Honor, this evidence on the proposition that it bears on the question of the fair market or the true or actual value of the agency in the determination of any special partners' participating percentage in the business."

The 1959 and 1965 contracts required the managing partner to keep the "proper and usual books and records pertaining to the partnership's business showing all of its assets and liabilities". They are silent as to what basis is to be used in valuing the assets. Apparently, the books were kept on a cash basis. The general ledger was not introduced into evidence, but from the record, we conclude that the renewals and expirations were not entered thereon as assets that had any value. They are not listed on the 1969 financial statement as assets of the partnership. They were not placed on the books of the partnership when the managing partner transferred all of the Agency business to the partnership following the execution of the 1959 Articles.

■ There is no showing that the books as kept by the managing partner of the partnership was ever questioned by anyone. No attempt was made to prove the value of renewals and expirations as assets of the Agency had they been valued on the books as assets in accordance with accepted accounting principles. The "market value" of the Agency, as measured by the value of renewals and expirations times a factor of three, as suggested by plaintiffs, is one thing; their current value as assets in computing the "book value" of the Agency is something else. Plaintiffs' stated purpose to the court in attempting to introduce the renewals and expirations into evidence as bearing "on the question of fair market value or the true or actual value of the agency" was not material to a determination of "book value" of the Agency in order to calculate the amount of money due plaintiffs for their interest therein. Where testimony is offered for a stated purpose for which it is inadmissible, and the court excludes it on proper objection, there is no error in the court's action, even though it might have been admitted for another purpose. Hudson v. Smith, 391 S.W.2d 441 (Tex.Civ.App.—Houston 1965, writ ref'd n. r. e.).

■ There are no allegations in plaintiffs' petition that there was fraud, accident, or mistake in connection with the execution of the contract documents. Plaintiffs did not allege that the term "book value" as used in the contracts was ambiguous. Therefore, they were not entitled to introduce evidence at the trial on the proposition that the term is ambiguous. Jones v. Dumas Development Co., 229 S.W.2d 936 (Tex.Civ.App.—Amarillo 1950, writ ref'd n. r. e.).

■ If there is no ambiguity, the construction of a written instrument is a question of law for the court. Myers v. Gulf Coast Minerals Management Corp., 361 S. W.2d 193 (Tex.Sup.1962). It has long been the rule that a contract not alleged to be ambiguous must be construed so as to ascertain the intent of the parties as expressed in the language used in the instrument itself. The instrument alone, in the usual case, will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls. City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515 (Tex.Sup.1968); Citizens Nat. Bank v. Texas & P. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003 (1941); 13 Tex.Jur.2d Contracts, § 122, pp. 287–290.

■ Extrinsic evidence to explain the meaning of words or terms appearing in a written instrument may be admitted only where the writing, on its face, is ambiguous, as where the language used is subject to two or more interpretations. Smith v. Liddell, 367 S.W.2d 662, 665 (Tex.Sup. 1963).

■ Where the provision in the instrument made the basis of controversy is not ambiguous, and where there is no allegation of fraud, accident or mistake, the court, in arriving at the intention of the parties, must confine its consideration to the instrument itself; the construction given the provision by the parties is immaterial; parol evidence is not admissible to vary its terms. Harriss v. Ritter, 154 Tex. 474, 279 S.W.2d 845 (1955).

■ We hold that the term "book value" as used in the 1959 and 1965 contracts is not ambiguous. Accordingly, it was not error for the trial court to refuse to admit into evidence the letters written by Sid Murray or the testimony of plaintiffs relating to the circumstances surrounding the execution of those contracts in order to ascertain the intention of the parties. The construction given the term by plaintiffs or what they intended the term to mean is immaterial.

Article XXVIII of the 1965 Amendment provides, in part, as follows:

"This agreement incorporates, as of the date hereof, all of the agreements between the parties hereto or between the Sid Murray Agency or Sid Murray, individually, and the other parties hereto. It supercedes all other oral or written agreements between the partners, or between any partner and Sid Murray, individually, or between each partner and the Sid Murray Agency, including prior commission arrangements, renewal agreements, partnership contracts, participation contracts or agreements of any other kind or character which relate in any manner to the insurance business".

■ The trial court correctly excluded the offer into evidence of the renewals and expirations as they were offered to establish market value of the Agency and not to establish their current value as omitted assets of the Agency. "Market value" of a business and "book value" thereof are not synonymous. Bendalin v. Delgado, 406 S. W.2d 897 (Tex.Sup.1966).

We have carefully considered all of plaintiffs' points of error and they are all overruled. Questions of fact were not raised by the evidence. The trial court properly withdrew the case from the jury and rendered a correct judgment.

The judgment of the trial court is affirmed.