850 So.2d 127 (2003)
BANK OF MISSISSIPPI, Trustee of MFC Services Liquidating Trust, Appellant,
v.
MISSISSIPPI LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION, Appellee.
No. 2001-CA-00546-COA.
Court of Appeals of Mississippi.
March 4, 2003.
*128 C. Delbert Hosemann Jr., Michael B. Wallace, Jackson, attorneys for appellant.
Robert B. House, Neville H. Boschert, Kristina M. Johnson, Jackson, attorneys for appellee.
*129 Before KING, P.J., BRIDGES, and LEE, JJ.
LEE, J., for the court.
¶ 1. A trustee pursued payment from the Mississippi Life and Health Guaranty Association (the Association) for coverage for sums lost pursuant to an annuity contract with an insolvent insurer. The Association denied coverage of the trustee's claim and that claim was litigated to the Mississippi Supreme Court which determined that the Association was in fact responsible for the claim in Bank of Mississippi v. Mississippi Life and Health Ins. Guar. Ass'n., 730 So.2d 49 (Miss.1998). The case returns to the appellate courts wherein the trustee challenges the rulings of the lower court on remand. The reasons therefor are more fully set forth in this opinion.

I.

FACTS
¶ 2. In 1987, the Manufactured Federated Cooperatives Pension Plan paid $2,341,000 to Executive Life Insurance Company purchasing a single premium guaranteed investment contract, which guaranteed annual interest payments at a rate of 9.55%, with a maturity date of November 18, 1992. On April 11, 1991, the California Department of Insurance placed Executive Life into conservatorship and on December 6, 1991, a California court entered an order of liquidation of the insurance company. Executive Life failed to pay interest on the investment contract in 1991 or 1992, and it failed to pay any principal on the maturity date.
¶ 3. In 1990, Mississippi Federated Cooperatives was sold requiring the termination of its pension plan. When other pension plan assets were distributed to beneficiaries on December 11, 1992, the investment contract, then in default, was assigned to the newly created Manufacturers Federated Cooperatives Services Liquidating Trust for the benefit of former participants in the pension plan. The Bank of Mississippi serves as the Trustee (the "Trustee") for the Liquidating Trust.
¶ 4. On December 16, 1993, over two years after a California court had ordered Executive Life liquidated, the Trustee received a settlement proposal from the liquidator, California's insurance commissioner. The proposal contained an election form whereby the Trustee could choose to accept a policy from Aurora National Life Assurance Company to replace the obligation on which Executive had defaulted. Language on the form included:
I elect to participate in the Rehabilitation Plan and accept the Restructured Contract endorsement and the assumption of such contract by Aurora National Life Assurance Company. I recognize that by participating in the Rehabilitation Plan, except as expressly preserved under the Enhancement Agreement, I am releasing all Participating Guaranty Associations from all payments and claims other than those provided under the Enhancement Agreement.... [I]f the Participating Guaranty Association box indicates "NONE," I retain all rights to assert that I am a contract owner covered under any applicable Guaranty Association statute.
When it executed the form on February 10, 1994, the Trustee inserted language expressly reserving "all rights to assert that it is a contract owner covered under the Mississippi Life and Health Insurance Guaranty Association Act or any other applicable Guaranty Association statute, and further reserving all claims against any applicable Guaranty Associations." By letter of March 3, 1994, the Trustee advised the Association that it had executed the election form and "reserved rights against *130 the State Guaranty Association in the event it was later determined we were not covered by the Association." The Trustee maintains that by virtue of its letter, the Association was aware of its (the Trustee's) position when the Association refused to participate in the settlement by its letter of March 18, 1994.
¶ 5. An Endorsement Specifications Page set the interest rates for the Aurora policy and according to the Trustee was not received by it until almost a year later, on August 4, 1995. The Endorsement Specifications Page represented the value of the Aurora policy to be $1,467,230.89, as opposed to Executive Life's debt of well over two million dollars.
¶ 6. The Trustee submitted a claim for reimbursement of the losses suffered by reason of Executive Life's default. On March 18, 1994, the Mississippi Life and Health Insurance Guaranty Association denied coverage under the Mississippi Life and Health Insurance Guaranty Association Act (the Act) having determined that Mississippi Code Section 83-23-205(2)(b)(vii) (Rev.1991) excluded the investment contract from coverage because the pension plan had been protected by the Pension Benefit Guaranty Corporation.
¶ 7. Subsequently, the Trustee filed suit to which the Association responded by moving for a partial summary judgment to limit its liability to $100,000 under certain provisions of the Act. The circuit court, the Honorable Swan Yerger presiding, entered final judgment in the Association's favor on August 21, 1997. On appeal, the supreme court reversed, ruling that the Association was liable for the investment contract and that the $100,000 limitation of liability in the 1985 Act "is inapplicable to a trustee." Id.
¶ 8. On remand to the circuit court, the Association contended that it was entitled to reduce its liability to the Trustee by 14.11% of the principal indebtedness, the percentage of the Trust held for the benefit of former MFC employees who were not Mississippi residents; that it was entitled to an additional reduction of .8263% of the principal debt because two individual beneficiaries held interests purportedly valued at more than $100,000; and that it was entitled to a lower rate of interest than that provided by statute or the investment contract. After the Association paid approximately $500,000 on Executive Life's debt, the Trustee moved for summary judgment on October 14, 1999. The Trustee asked the court to award the full amount of the unpaid principal, plus interest compounded daily at the contract rate of 9.122%.[1] Alternatively, the Trustee asked that interest after the investment contract's maturity date of November 18, 1992, be set at the legal statutory rate of 8% compounded annually. According to the Trustee, by the judgment date of February 15, 2001, total principal and interest at the contract rate would have reached $1,532,094 or, at the statutory rate of 8%, a total of $1,146,573.
¶ 9. On November 5, 1999, the Association filed its cross-motion for summary judgment, seeking to reduce its interest obligation to those rates shown on documents associated with the contract the Trustee entered into with Aurora National Life Assurance Company in settlement of its claim in the California rehabilitation proceeding. The Association argued, "By accepting the benefits of the Enhancement Agreement, the Trustee agreed to waive all claims against [the Association] for all *131 additional amounts payable under the pre 1990 Act other than the amounts that [the Association] would have paid under the Endorsement Agreement." The Association's expert used the Aurora interest rates to calculate its liability for the Executive Life investment contract.
¶ 10. On November 16, 1999, the Trustee moved to strike much of the evidence supporting the Association's cross-motion on the grounds of hearsay and that such was outside the scope of the Association's pleadings. The Association responded by moving to amend its pleadings to conform to the evidence, contending that the Trustee had admitted participation in the rehabilitation plan administered in the California proceedings and was therefore bound by the lower interest rates found on the endorsement specifications page of the contract it held with Aurora. In its opposition to that motion, the Trustee emphasized that the election form accepting the terms of the Aurora contract preserved its rights against the Association.
¶ 11. Nearly a year later, on October 2, 2000, the circuit court transmitted via a facsimile an unsigned document to counsels for the parties. In such communication, the circuit court indicated its ruling that:
3) The [Trustee] is entitled to summary judgment in the amount of $1,102,444.20 and interest at the statutory rate of 8% thereon from the date of judgment.
4) The [Association's] Cross-Motion for Summary Judgment is denied. The attorneys for the [Trustee] may furnish an order thereon.
The figure announced by the circuit court corresponded to the request in the Trustee's motion for interest at the rate of 8% after the maturity date of November 18, 1992. Giving credit for the Association's final payment and other adjustments, principal and interest at the statutory rate of 8% would have reached $1,146,573 by the time of final judgment on February 15, 2001.
¶ 12. After this communication, the Association's counsel wrote Judge Yerger on October 12, 2000, again requesting that interest be reduced to the rates paid by Aurora. Counsel for the Association concluded, "[a]ccruing interest at the rates agreed upon by the Trustee for the renewed [investment contract] would place the Trustee in the same position it would have been if Defendant had provided guaranty association coverage initially."
¶ 13. On January 4, 2001, the circuit court again provided an unsigned document to the parties announcing its intention to grant the Association's motion to amend its pleadings and to deny the Trustee's motion to strike the evidence supporting the Association's cross-motion for summary judgment. Nonetheless, the circuit court reiterated its denial of the crossmotion and its decision to grant the Trustee's motion for summary judgment. In its correspondence, the circuit court agreed to sign the Trustee's proposed version of the summary judgment order upon the deletion of two paragraphs.
¶ 14. In response, the Association's counsel wrote Judge Yerger on January 5, 2001. Again advancing its entitlement for reduced interest rates, the Association asked that the summary judgment order be further modified to include the following paragraphs:
6. After maturity of the original GIC, the Liquidating Trust elected to participate in the Executive Life Rehabilitation Plan and to accept a restructured contract endorsement and an assumption of the GIC by Aurora National Assurance Company ("Aurora") and the indebtedness accrued interest at the *132 rates established by the amended and restructured GIC.
7. After maturity of the amended and restructured GIC on September 2, 1998, the indebtedness accrued interest at the rate of ____% per annum (either 5.61% as in the amended GIC or 8.00%).
On January 26, 2001, the circuit court signed a summary judgment order including the modifications requested by the Association evincing the circuit court's decision to apply the statutory rate of 8% for the period after September 2, 1998. Additionally, the order gave each party seven days to submit affidavits quantifying the amount of the remaining debt.
¶ 15. In addition to filing its affidavit of remaining debt, on February 2, 2001, the Trustee filed its motion for clarification of the summary judgment order noting a gap which appeared in the assessment of interest under the order:
Paragraph 5 of the order imposes the interest rate of 9.122% through November 18, 1992, and the statutory rate of 8% after September 2, 1998, but does not specify a rate for the period between those dates. Paragraph 6 refers to interest to be paid by Aurora National Assurance Company, but does not set forth the relevance of those rates.
In its motion, the Trustee asserted that it had reserved all of its rights against the Association which had not received any consideration for the lower interest rates the Trustee accepted with the new contract with Aurora. Responding to the motion for clarification on February 9, 2001, the Association submitted an affidavit calculating its indebtedness using the rates which the Trustee had agreed to accept from Aurora.
¶ 16. On February 12, 2001, the Trustee moved for an award of the administrative and legal expenses it had incurred since the remand from this Court. The Trustee contended that the Association had "vexatiously" contested its liability for the full amount of the principal of the investment contract. Pursuant to Mississippi statute, rule and common law, the Trustee argued that such an award was justified in this case.
¶ 17. On February 15, 2001, even without the benefit of the Association's response which was filed a few days after the order was entered, the circuit court denied the Trustee's motion for clarification and motion for award of expenses. At the same time, the circuit court entered final judgment against the Association in the amount of $622,970, the amount calculated by the Association in applying the lower Aurora National interest rates. The Trustee filed a timely notice of appeal.
¶ 18. Given the supreme court holding in the previous appeal, all those involved in this case now agree as to the source of the Association's obligation and the date of its accrual. It is the applicable interest rates to the principal amount and the denial of a request for attorney's fees and costs that is the cause of this appeal. The Association bases it claim to entitlement of the lower interest rates on its assertion that the Trustee waived its right to recovery of interest at the contract rate of 9.122% or the statutory rate of 8% when it entered a new contract in the liquidation proceedings of Executive Life. Conversely, the Trustee maintains that because the Association took no part in its settlement vis-a-vie the new policy with Aurora, it is not now entitled to the interest rates of the Aurora contract. The Association contributed no money toward the settlement of the Trustee's claim in California.
¶ 19. In its statement of undisputed material facts filed with its original motion for partial summary judgment on February 29, 1996, the Trustee acknowledged *133 that it had mitigated its damages by accepting the Aurora policy. The Association maintains that this admission binds the Trustee to the rates of the Aurora policy and the Trustee is not entitled to an amount over and above it would have received had Executive Life not become insolvent or had the Association not initially determined that it was not responsible for coverage of the Trustee's claim. Accordingly, the Association advances that the final judgment rendered by the circuit court places the Trustee back into the position they would have found themselves in had these two events not occurred.

II.

ISSUES
¶ 20. On appeal to this Court, the Trustee asserts that the circuit court erred in determining the amount the Association owed to the Trust and specifically when it utilized the interest rate of the Aurora contract to which the Association was not a party. Next, the Trustee maintains that the circuit court erred in not awarding interest from the date of maturity of the investment contract through the judgment date at a contract rate of 9.122%. Finally, the Trustee argues that the Association's conduct after remand justified an award of administrative and legal expenses so as to make whole the beneficiaries of the trust.
¶ 21. At the outset, we note that our role in this case is to simply review the trial court's decision to ensure there was no abuse of discretion. In a lengthy discussion, the dissent attempts to confuse and confound the true issues in this case and, as a result, misses the point. The dissent would have the reader believe that we are to consider various other issues, including punitive damages, frivolous actions, and the like; however, these were clearly considered by the trial judge when he reviewed the Trustee's thoroughly written motion seeking such relief. Although we might review the facts of an individual case and quite possibly rule differently than the trial judge, as an appellate court this is not within our prerogative to do so. We must abide by our requisite standard of review which, in this case, is to reverse only if we find the trial judge abused his discretion or other error meriting such not retry the case.

III.

RESOLUTION OF THE ISSUES
1. Effect of the Aurora contract
¶ 22. Following the supreme court's previous decision in this matter, the Association conceded that it was obligated to the policyholders as of December 6, 1991, the date in the Executive Life insolvency proceedings upon which residency determinations were made and the date on which the California Superior Court issued its liquidation order against Executive Life. The circuit court agreed that as of that date the Association became responsible for payment of Executive Life's debt which included interest.
¶ 23. The Trustee maintains that the circuit court thereafter erred in calculating the interest. Under section 8(9) of the 1985 Act, the Association's obligations to the Trustee are as follows:
The contractual obligations of the insolvent insurer for which the association becomes or may become liable shall be as great but no greater than the contractual obligations of the insolvent insurer would have been in the absence of an insolvency....
Miss.Code Ann. § 83-23-205(3)(a) (Supp. 1989). In the absence of an insolvency, Executive Life would have been contractually obligated to pay the full amount of the annuity, with accrued interest on November *134 18, 1992. After failing to do so, interest would have continued to accrue according to established principles of Mississippi law which at all relevant times was 8%. The Association became liable for the contractual failures of Executive Life and the appropriate interest rate of 8% from and after the maturity date of the annuity.
¶ 24. After the declaration by the California court of Executive Life's insolvency, the pension plan's liquidating trust was offered the opportunity to enter into a new investment contract with Aurora. It accepted the offer. Under the new investment contract, the pension plan was to receive a much lower interest rate on its investment. The circuit court's final order drafted by the Association stated:
After maturity of the original [investment contract], the Liquidating Trust elected to participate in the [Executive Life] Rehabilitation Plan and to accept a restructured contract endorsement and an assumption of the [investment contract] by Aurora National Assurance Company ("Aurora") and the indebtedness accrued interest at the rates established by the amended and restructured [investment contract].
¶ 25. The Trustee argues on appeal that because the Association was not a party to the new contract it negotiated, the Association is not entitled to the benefit of the lower interest rate. In opposition, the Association maintains that the trial court applied the appropriate rates of interest for the appropriate time periods and that circuit court's opinion and final judgment ought be affirmed. Taking the position that because the Trustee renewed the original investment contract with a new company, Aurora, it is bound to the new interest rates; the Association claims that it is only responsible for the shortfall in the investment contract's value. According to the Association, the appropriate interest rates were the rates for the period that the renewed investment contract was in effect as established by the Enhancement Agreement and set forth in the renewed investment contract. The Association argues that the Trustee is not entitled to the original investment contract interest rates for the shortfall amount after maturity of the original investment contract. It charges that because Executive Life had no such obligation, then neither does the Association.
¶ 26. In determining the propriety of the circuit court's decisions in this matter, we are guided by the purposes for which the Mississippi Legislature created the Mississippi Health and Life Insurance Guarantee Association. In the prior appeal in this case, the supreme court stated:
The Mississippi Legislature has clearly stated its intent "to protect ... against failure in the performance of contractual obligations, under ... annuity contracts." Miss.Code Ann. § 83-23-203(1) (1991). Despite this purpose being made "subject to certain limitations," those limitations and the rest of the statute "shall be liberally construed to effect the purpose under Section 85-23-203 which shall constitute an aid and guide to interpretation." Miss.Code Ann. § 83-23-207 (1991).
Bank of Miss., 730 So.2d at 57. As such, the Association's purpose is to protect insureds, in certain cases, from the failures of other similarly situated insurance companies. The Association steps into the shoes of the defaulted insurance company and, in effect, assumes the obligations the defaulting company had.
¶ 27. To carry out the spirit and intentions of the Mississippi Legislature for the purpose of the creation of the Association, we rule that the circuit court appropriately utilized the lower interest rates at play in this case. The purpose of the Association *135 is not to give the claimants here more than they would have received had Executive Life been held directly accountable for the amounts owed rather than sheltered by the tent of bankruptcy proceedings. We are not persuaded by the argument that the Trust is entitled to the amount of the shortfall and interest at the annuity's contract rate until the debt was paid. At the end of the contract period, Executive Life and the pension plan were to either negotiate a new rate or end their relationship. Because of Executive Life's insolvency, a new rate was never negotiated. Rather, their relationship ended by the insolvency. However, as part of the rehabilitation plan in the California court involved in the insolvency proceedings, the pension plan's liquidating trust was given the opportunity to "cut its losses," so to speak. Though the Trust reserved its rights against the Association for any losses suffered by the Trust, such a provision does not entitle the Trust to receive more than it would have had it not mitigated its losses. Applying the contract rate or the legal rate of interest to the amounts owed by the Association would, in effect, give to the Trust more than it would have received if it had recovered damages from Executive Life directly.
¶ 28. We mention, however, our distress at the great lengths the Trustee had to go in order to receive its due restitution on behalf of its beneficiaries. The records make it clear that the Trustee was required to fight vigorously to receive that which it was entitled from the very beginning. There seems to be very little in the statutory scheme to encourage the Association to promptly pay claims. In fact, because, as will be discussed below, punitive damages may not be had against the Association, it has every reason in the world to fight the payment of a five hundred thousand dollars plus claim. After all, the insurance businesses which are a part of this involuntary association are in the business of making money and would prefer not to pay out sums their competitors owe because such businesses failed or otherwise defaulted on good contracts.
¶ 29. Notwithstanding this view, we find that in the case before us, the circuit court correctly used the Aurora rates in calculating damages because to use any others would serve to give a windfall to the Trustee to the detriment of the general public at large who would see such costs unfairly passed to them in the form of premium increases.
2. Attorney's fees and expenses
¶ 30. Because the Association did not provide coverage initially, the Trustee maintains that it has incurred the expenses for ten years of litigation, including two appeals, to compel the Association do what it ought to have done in the beginning. According to the Trustee, in order to make the beneficiaries of the Trust whole, not only must it recover the appropriate judgment against the Association, but must also recoup the expenses it incurred in pursuing that judgment, which the Trustee reports have been substantial.
¶ 31. The Trustee's bank officer submitted an affidavit explaining the duties required in administering the affairs of the 1180 beneficiaries of the trust. Periodically, checks and other communications were prepared and mailed. In addition, income tax returns were filed for the Trust annually. The Bank of Mississippi, as Trustee, reports a total of $31,880 in expenses were incurred in 2000. Further, it reports $95,130 in legal services and $11,661 in litigation expenses were required in making its claims and pursuing a judgment from the supreme court; furthermore, it continues to expend funds to support this litigation on appeal.
*136 ¶ 32. The Trustee vehemently asserts that to place the beneficiaries of the Trust in the same position it would have been had the Association provided coverage initially, this Court would have to award the Trustee all of its costs since the initial filing of the suit in 1996. However, the Trustee claims that it only requested the circuit court to award only those expenses incurred after this Court found coverage to exist in the original appeal.
¶ 33. The Trustee argues that while the Association arguably had a plausible basis for its initial denial of coverage, its subsequent attempt after the supreme court's ruling in the matter to avoid payment of the entirety of the principal and interest owed by Executive Life was indefensible and constitutes bad faith. The Trustee points out that the Association's contentions that it owed the Trustee no compensation for beneficiaries living outside Mississippi or having an interest of more than $100,000 in the proceeds of the guaranteed investment contract were rejected by the circuit court.
¶ 34. The Trustee contends that this Court has three sources of authority to grant it the relief it requests, namely, Mississippi Code Annotated section 11-55-5(1) (Supp.2001), Mississippi Rule of Civil Procedure 11(b), and common law that provides attorney's fees may be awarded where a party's conduct would justify an award of punitive damages, even when such damages are not actually awarded. Section 11-55-5(1) permits an award of attorney's fees in cases where the court "finds that an attorney or party brought an action, or asserted any claim or defense, that is without substantial justification, or that the action, or any claim or defense asserted, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceedings by other improper conduct." Miss.Code Ann. § 11-55-(5)(1) (Supp. 2001). "Without substantial justification" is defined as conduct classified as "frivolous, groundless in fact or law, or vexatious, as determined by the court." Miss. Code Ann. § 11-55-3(a) (Supp.2001). Mississippi Rule of Civil Procedure 11(b) authorizes a court award of attorney's fees when a "party files a motion or pleading which, in the opinion of the court, is frivolous or is filed for the purpose of harassment or delay." Lastly, attorney's fees may be granted in cases where, based on an opposing party's conduct, punitive damages may be awarded, even though punitive damages are not actually awarded. Aqua-Culture Tech., Ltd. v. Holly, 677 So.2d 171, 184 (Miss.1996).
¶ 35. The Trustee claims that the Association's statutory arguments in its crossmotion for summary judgment were wholly without substantial justification and were "vexatious" within the meaning of section 11-55-3(a) of the Mississippi Code. While the term "vexatious" has not been defined by this Court or the supreme court, the Trustee points us to BLACK'S LAW DICTIONARY'S definition of the term which provides: "vexatious delay. An insurance company's unjustifiable refusal to pay on an insurance claim, esp[ecially] based on a mere suspicion but no hard facts that the claim is ill-founded." BLACK'S LAW DICTIONARY, 1559 (7th ed.1999).
¶ 36. The Trustee maintains that the Association's "vexatious delay" was caused when it failed to assert all its defenses before this action was appealed to the supreme court. One factor to be considered by a court in determining whether to award fees and costs is "[t]he period of time available to the attorney for the party asserting any defense before such defense was interposed." Miss.Code Ann. § 11-55-7(k) (Supp.2001). In addition, the Trustee contends that the Association relied *137 upon "baseless statutory arguments in contravention of the plain language of § 8(3)(b) of the pre 1990 Act which required [the Association] to `[a]ssure payment of the contractual obligations of the insolvent insurer to residents.'" The Trustee, relying on Garner v. Hickman, 733 So.2d 191, 198 (Miss.1999), argues that the Association "acted ... unreasonably [to] protract the proceedings." Id. at 198, and noted that the supreme court, in Wyssbrod v. Wittjen, 798 So.2d 352, 360 (Miss.2001), affirmed an award of $73,595.02 under the Litigation Accountability Act for pursuing baseless arguments. Even further, the Trustee argues that even after the Association asserted that it need not pay the full indebtedness due to the Trustee, a Mississippi resident, but only that portion attributable to the interests of beneficiaries who are Mississippi residents, the Association refused to pay a separate claim of Mississippi residents because their Trustee is not a Mississippi resident.
¶ 37. The Association responds pointing out that it is the Mississippi Legislature's intent to protect it and its representatives from exactly the type of claims that the Trustee asserts on appeal. The applicable version of the Act provides:
There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer or its agents or employees, the association or its agents or employees, members of the board of directors, or the commissioner or his representatives, for any action or omission by them in the performance of their powers and duties under this article. Such immunity shall extend to the participation in any organization of one or more other state associations of similar purposes and to any such organization and its agents or employees.
Miss.Code Ann. § 83-23-231 (Rev.1999). The Association advocates that its powers and duties are vested and protected by the Act and include taking "such legal action as may be necessary to avoid payment of improper claims." Miss.Code Ann. § 83-23-215(12)(e) (Supp.1989) (1985 Miss. Gen. Laws, ch. 482 § 8(f)). The Association claims that it has defended the action commenced by the Trustee to avoid payment of the Trustee's improper claims.
¶ 38. For approximately ten years, the Bank of Mississippi as Trustee for the Trust has employed the services of attorneys to advance their claims for the sums of money due the Trust from a fair and bargained-for contract. The Trustee points to the vigorous fight it has endured to obtain funds to which it was rightfully entitled. The Association defends that at all times it asserted viable and credible defenses advancing that it had a duty to the Association membership to pay only those claims it was required by law to pay.
¶ 39. Generally, absent a statute allowing such an award, attorney's fees and costs are not awarded unless punitive damages are awarded or may be awarded. Netterville v. Mississippi State Bar, 404 So.2d 1026, 1028 (Miss.1981). Pursuant to case and statutory law, punitive damages may not be levied against the Association. Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n., 560 So.2d 129, (Miss.1989); Miss.Code Ann. § 83-23-231 (Rev.1999). The supreme court ruled as much concluding that to impose such penalties would be unfair because the general public would be burdened with the increase in premium costs because individual insurers would inevitably pass on such costs to the consuming public. Bobby Kitchens, Inc., 560 So.2d at 134. In so ruling, our supreme court adopted the rationale for doing so from a California ruling in Isaacson v. California Insurance Guaranty Association, *138 193 Cal.App.3d 93, 215 Cal.Rptr. 652 (1985). There, the California court stated and the Mississippi Supreme Court quoted in its Bobby Kitchens, Inc. opinion:
[I]f punitive damages are imposed on [California Insurance Guaranty Association] CIGA, the increased premiums would be spread among all insurers, and ultimately to all insureds, regardless of the culpability of the individual insurer. There might indeed be a deterrent effect on CIGA; but compensatory damages will achieve that effect, without the possible devastating effect on the public. Appellants are not entitled to recover punitive damages against CIGA. Isaacson, 215 Cal.Rptr. at 666-667. This rationale is applicable in this case, in that the portion of the summary judgment ruling denying punitive damages is correct. We find that as a matter of law, [Mississippi Guaranty Association] cannot be liable for punitive damages.

Bobby Kitchens, Inc., 560 So.2d at 134 (emphasis added).
¶ 40. We recognize that the result of such a rule leaves insureds and beneficiaries in a position of possibly having to wage a vigorous battle to obtain sums to which they are entitled since the Association is protected from claims for intentional delays. The rules, therefore, permit the Association to circumvent the spirit and intent of the Act which is that it is to be liberally applied. This case evinces the efforts of but one group which has had to zealously combat the resistance of an association whose primary existence is to assist and protect them from impaired and insolvent insurers.
¶ 41. In the judge's order denying the Trustee's requested attorney's fees and interest, the judge considered the issues; he had been presented with a detailed motion for fees and interest and had considered the same and found no award was justified. We find there is little doubt that the Association stretched the limits in various defenses raised. While skirting the limits, though, their actions did not justify imposing a penalty against them. We note, however, that we do not set precedent here that attorney's fees and costs of litigation may never be awarded in cases against the Mississippi Life and Health Insurance Guaranty Association. Compelling is the Trustee's argument that to make them whole, they should be awarded attorney's fees and litigation expenses. However, in this case the circuit court did not find an award of attorney's fees and costs appropriate. Contrary to the dissent's suggestion that remand is in order for the judge's repeated consideration, we find the judge fully considered all relevant information and ruled accordingly; thus, we conclude that his decision was not an abuse of discretion. Therefore, we affirm.
¶ 42. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, P.J., BRIDGES, THOMAS AND MYERS, JJ., CONCUR. SOUTHWICK, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY MCMILLIN, C.J., IRVING AND CHANDLER, JJ. GRIFFIS, J., NOT PARTICIPATING.
SOUTHWICK, P.J., Dissenting:
¶ 43. With respect for the majority, I find myself in disagreement as to both appellate issues. The interest rate applicable to the Trustee's remaining claim after mitigation of damages in the California proceedings was not modified by that settlement. Nothing there affected the Trustee's rights for pursuing the balance under its original contract. Secondly, the *139 statutory immunity that applies to the Guaranty Association for its acts and omissions does not apply to a court's essential right to impose penalties on a party whose conduct in the litigation has been vexatious.
¶ 44. I would reverse and render as to the applicable interest rate. I also would reverse and remand so that the trial judge could consider whether the Guaranty Association's conduct justified the imposition of additional costs of litigation.
What is this case about?
¶ 45. Before beginning the review of the specific issues, I found it helpful to place the dispute within its regulatory framework.
Most states have "life and health insurance guaranty association" acts. These acts are designed to protect many categories of policyholders should the insurance company that issued the policy become insolvent....
A. Structure of state guaranty associations:
In the case of the insolvency of a major insurance company, a guaranty association can be expected to pay claims of covered policyholders only after completion of the insolvency proceedings. These proceedings are likely to take several years. Each state guaranty association would raise funds to pay claims by assessing those solvent insurance companies that continue to do business within the state. Under the law of most states the assessment is a credit against the income, franchise or premium taxes the insurance companies would otherwise have to pay. Thus, the taxpayers end up bearing a large part of the economic burden of the insurance company insolvency.
B. NAIC Model Acts:
Most states having guaranty association acts pattern their laws after the National Association of Insurance Commissioners' Life and Health Insurance Guaranty Association Model Act (the "Model Act"). The Model Act was originally proposed in 1970 and it was restated in 1975. The Model Act was substantially amended in 1985 and restated in December, 1987.[2]
¶ 46. The then-largest failure of an insurance company in United States history, and the corresponding largest demands on this entire regulatory scheme, was the failure of Executive Life Insurance Company.[3] Its demise started these parties on their journey to us, and likely beyond.
1. Interest rate.
¶ 47. Resolving the issue of the interest rate applicable to the unpaid portion of the investment contract starts with analyzing the effect of the proceedings involving the California Department of Insurance in 1991-1993. The factual explanation of those proceedings appears in the Supreme Court's opinion in the first appeal in the present litigation. Bank of Miss. v. Mississippi Life & Health Ins. Guar. Ass'n, 730 So.2d 49, 51-52 (Miss.1998). In summary, the original issuer of the investment contract, Executive Life Insurance Company, was formally declared insolvent by California regulators in 1991. It remained insolvent at the time that the investment contract that is in issue in this appeal matured on November 18, 1992. Ten *140 months later, a rehabilitation plan for the insurance company was approved by a California court in September 1993.
¶ 48. The Trustee, as successor to the original beneficiary of the investment contract, was given the option by the California Insurance Commissioner to participate in the rehabilitation plan. The election form had a block that would indicate whether the relevant state guaranty association for that contract owner was participating in the rehabilitation plan. The form given the Trustee stated "to be determined" in the block; the Mississippi association ultimately did not participate. The Trustee elected to participate but explicitly reserved all its rights against the Mississippi Life & Health Insurance Guaranty Association that is its antagonist in the present litigation.
¶ 49. One effect of the election was to entitle the Trustee to receive a portion of the total value of the original investment contract by accepting a new policy from a solvent insurance company. As explained in a document sent to contract holders, the "existing insurance contracts were restructured... in accordance with the [rehabilitation] Plan. The restructuring permanently adjusted the account value or benefit payment" of the original investment contract. The Trustee's new contract was worth less than the old but it reserved the right to pursue the balance. The present litigation is the Trustee's effort to recoup the difference. Moreover, the interest rate provided under the new policy that satisfied part of the Trustee's claims was substantially lower than that under the original contract.
¶ 50. State guaranty associations such as the Mississippi one involved here, had been given the opportunity to contribute financially to the California imposed rehabilitation plan. According to documents in the record, a few weeks after the election by the Trustee, it became aware that this state's Guaranty Association would not participate in enhancing the plan. Indeed, other documents from the same time period reveal that the Guaranty Association argued that it had no liability for the shortfall because the federal Pension Benefit Guaranty Association provided protection for the loss. Part of what the first appeal in this suit resolved was that the state's Guaranty Association was liable despite its arguments regarding the federal association. Bank of Miss., 730 So.2d at 54-57.
¶ 51. When the Trustee made its election under the rehabilitation plan in 1994, it explicitly reserved its rights against the state Guaranty Association. Despite that reservation, the state Guaranty Association argues that the interest rates established under the California plan apply to its liability. Since the Guaranty Association did not participate in the California settlement, disclaimed any liability, refused financially to enhance the plan, and by Mississippi statute has the same "contractual obligations [as] the insolvent insurer," its argument about interest rates is rather counter-intuitive. Miss.Code Ann. § 83-23-205(3)(a) (Rev.1999). Had the liquidation of the original insurer not occurred and the rehabilitation plan not been entered, the state Guaranty Association would have been liable under the original contract for the entire unpaid amount plus the interest required under the contract.
¶ 52. The majority here makes the argument that the overall "spirit and intentions" of the state's statutes in this arena are why the lesser interest rate of the California rehabilitation plan must apply. I can agree with the majority that the Trustee is not necessarily entitled to a continuation of the daily compounded interest of the original contract once the maturity date passed, but that is simply a *141 matter of contract interpretation and usual law on post-default interest which I leave for a later section of this dissent. I find nothing in the majority's argument, though, that justifies applying the interest rate of a settlement in the liquidation of the original insurer to the remaining liability of an entity who avoided those proceedings. Our state's Guaranty Association is responsible for the balance left out of the settlement. The majority gives it the benefit without any of the burden of those proceedings. Neither equity nor law provides a justification.
¶ 53. Where I start in finding the answer to these issues is with the original investment contract. It provided that the daily compounded interest of 9.122% applied "from the date of issuance until the date of maturity."[4] The latter date was November 18, 1992. The Guaranty Association agrees that until that 1992 date the contract rate applied. The question becomes the interest rate thereafter. The trial court found that the statutory rate of 8% applied immediately thereafter, and then the rehabilitation plan's interest rates applied once the plan was implemented in 1993. As already explained, the rates in the rehabilitation plan should not apply to the Guaranty Association who did not participate and paid no consideration for a change in the following statutory duty: the "contractual obligations of the insolvent insurer for which the [guaranty] association becomes liable shall be as great but no greater than the contractual obligations of the insolvent insurer would have been in the absence of the insolvency." Miss.Code Ann. § 83-23-205(3)(a).
¶ 54. In summary, the majority holds that the rehabilitation plan not only set an interest rate for the amount of the Trustee's claim that was resolved in the California proceedings, but it also set an interest rate for anything eventually paid on the balance by someone else. Whether the Guaranty Association would pay anything has been in dispute ever since the California proceedings ended. I cannot fathom why the interest rate was the one matter that was concretely established.
¶ 55. I now turn to what the relevant interest rate would have been for the original insurance company's obligations. That became the obligation of the Guaranty Association as well since nothing has occurred to alter that rate. Two statutes are relevant. One applies to judgments:
All judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt on which the judgment or decree was rendered. All other judgments or decrees shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint.
Miss.Code Ann. § 75-17-7 (Rev.2000). This specifically refers only to interest on judgments and does not address interest during the period from breach of a contract until judgment. The second sentence of the statute I find to be irrelevant in a contract case.
¶ 56. The Supreme Court referred to a broader time period, but also to a statutory and not a contract rate, when it held *142 "that the prevailing party in a breach of contract suit is entitled to have added legal interest on the sum recovered computed from the date of the breach of the contract to the date of the decree." Stockett v. Exxon Corp., 312 So.2d 709, 712 (Miss. 1975) (quoted in Sentinel Industrial Contracting Corp. v. Kimmins Industrial Service Corp., 743 So.2d 954, 971 (Miss.1999)). The Court in Kimmins ordered "prejudgment interest on the damages for breach of contract in this case, calculated at 8% per annum from the date of the breach to the date of judgment." Kimmins, 743 So.2d at 971, citing Miss.Code Ann. §§ 75-17-1(1) (Supp.1998) & 75-17-7 (1991).
¶ 57. The first statute cited in Kimmins is the other potentially relevant one. Section 75-17-1 provides that the "legal rate of interest on all notes, accounts and contracts shall be eight percent (8%) per annum, calculated according to the actuarial method, but contracts may be made, in writing, for payment of a finance charge as otherwise provided by this section or as otherwise authorized by law." Computations under the "actuarial method" phrase were explained in Estate of Baxter v. Shaw Associates, Inc., 797 So.2d 396, 403-407 (Miss.Ct.App.2001). The Supreme Court has referred to this statute as a source for an applicable interest rate for prejudgment interest that was calculated from the date of the complaint until the date of judgment. Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc., 725 So.2d 902, 921 (Miss.1998). The Court did not seemingly require that interest rate in every similar situation but only upheld the trial judge's use of the figure.
¶ 58. Thus, I see four time periods for determining the rate of interest. The earliest is the period leading up to the date of maturity; the last is the period that begins with judgment and ends with payment. For the first I find the contract rate applicable because the contracting parties specifically agreed to the rate for that period. I also find that the contract rate could be made applicable to the last time period, because section 75-17-7 provides that "judgments or decrees founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt." The intermediate two periods are less clear. One section of time is between the date of maturity until the date of suit. The remaining one begins at that point and continues until the date of judgment. I will now explain my conclusions as to each period.
¶ 59. No one questions in this suit that interest during all of these periods is to be paid. In one of the precedents already cited, the Court relied upon an earlier decision for the proposition that in a contract suit, the successful party is entitled to "legal interest on the sum recovered computed from the date of the breach of the contract to the date of the decree":
But where the suit is a suit to enforce the obligations of a contract for the payment of money, as in this case, the right of the complainant to recover interest is fixed by the statute. Interest in a case of this kind is not imposed as a penalty for wrong doing; it is allowed as compensation for the detention of money overdue.
Rubel v. Rubel, 221 Miss. 848, 874, 75 So.2d 59, 69 (1954) (cited in Stockett, 312 So.2d at 712). The statute mentioned in Rubel is the predecessor to section 75-17-1(1), that at that time provided that the "legal rate of interest on all notes, accounts and contracts shall be six percent per annum [now eight percent]; but contracts may be made, in writing, for a payment of a rate of interest as great as eight per centum per annum." Miss.Code Ann. § 36 (1942). Quoting a still-earlier authority, the Rubel Court concluded that this *143 "`statute means that the rate of interest on accounts and contracts shall be 6 percent. per annum where there is no agreement between the parties as to interest. The amount due under an account or contract bears 6 percent. interest from the time it is due and payable, unless it is otherwise provided by agreement of the parties.'" Rubel, 221 Miss. at 872, 75 So.2d at 68-69 (quoting Stowell v. Clark, 152 Miss. 32, 118 So. 370, 372 (1928)).
¶ 60. What it means for the parties to have "provided by agreement" for an interest is not stated. Here, the daily compounded interest of 9.122% applied "from the date of issuance until the date of maturity." Our issue becomes whether there is any "agreement of the parties" for interest thereafter.
¶ 61. I do not see that as an issue for the interest on the judgment itself, as by statute the judgment rate is to be the "same rate as the contract evidencing the debt." Miss.Code Ann. § 75-17-7. I find a logical reading is that no requirement exists that the contract have an interest applicable to judgments, only that it must contain an interest rate which is then used for the judgment. If the contract contains more than one interest rate for different time periods, then the rate most applicable to post-judgment should be chosen. The statutory interpretive decision is a close one, though, and I find some textual support for concluding that if there is not a post-maturity rate stated in the contract, then the rate on contracts without interest rates applies. Under section 75-17-1, a contract without a stated interest rate bears eight percent interest. Under that interpretation, the judgment rate, which is the "same rate as the contract evidencing the debt," would also be eight percent. Miss.Code Ann. §§ 75-17-1(1) & 75-17-7. The Trustee in its brief agrees with the trial judge that the interest on the judgment itself is eight percent. Thus by concession if not firm interpretation, I accept that such is the judgment rate for this suit.
¶ 62. The parties' battle in this case, then, is not over the prematurity or post-judgment rate, but the rates to be used between those two dates. To determine an interest rate after maturity and before judgment, the Trustee cites us to some late nineteenth century cases that extend the contract interest rate past maturity even if the contract does not provide for a post-default/post-maturity rate. Meaders v. Gray, 60 Miss. 400 (1882) ("there is no plausible ground for the assertion that the stipulated rate of interest ceases at maturity of the debt"); Tishimingo Sav. Inst. v. Buchanan, 60 Miss. 496, 504 (1882) (same). The Trustee candidly, properly, but singularly acknowledges an opposing precedent. A somewhat later case held that the contract rate ends on maturity and the statutory rate applies thereafter. Hamer v. Rigby, 65 Miss. 41, 3 So. 137 (1887). The case has not subsequently been cited and that Hamer is an aberration is advanced by the Trustee.
¶ 63. Instead of relying solely on precedents as dated as these, I look also to another principle. Statutes are to be read in a common sense fashion, which has also been stated as the requirement to utilize the "ordinary and customary meanings" of statutory words. Jones v. Mississippi Dept. of Transp., 744 So.2d 256, 259 (Miss. 1999). One statute here states that a judgment "founded on any sale or contract shall bear interest at the same rate as the contract evidencing the debt" that is the basis for the judgment. Miss.Code Ann. § 75-17-7. Another statute makes 8% calculated according to the actuarial method applicable on contracts without stated interest rates. Miss.Code Ann. § 75-17-1(1). For the time period after maturity and before judgment, I find that the contract *144 provided for no interest rate.[5] Therefore the 8% rate calculated according to the actuarial method applies to that block of time. I do not propose overruling 1882 Supreme Court authority to the contrary. It appears, however, that those cases have been superceded. E.g., Kimmins, 743 So.2d at 971.
¶ 64. Since I find that the prematurity and post-judgment time periods permit the use of the contract rate, making that rate apply even in the intermediate period would be the simplest approach. What is simplest is not always what statutes by their terms provide. One statute explicitly concerns interest on contracts, utilizes the contract interest rate, but cannot by its terms be made to apply to any time period prior to judgment. The legislature could explicitly have provided in section 75-17-7 that the interest in the contract shall apply commencing on the date of breach, but it did not. Thus there is no statutory authority to make the contract interest rate begin any earlier than judgment.
¶ 65. Applying the statutes and this contract's terms, I would make these rulings on interest. Until the date of maturity, the contract interest rate applied. Beginning then and continuing until judgment, the rate of section 75-17-1(1) applied. Since the Trustee has conceded that the 8% interest also applies to the judgment, the possibility that the contract rate might again be applied after judgment is not in issue. Instead, the section 75-17-1(1) rate continues until the judgment is paid.
¶ 66. I would reverse and render on the issue of the interest rate.
2. Attorneys fees and court costs.
¶ 67. The Trustee argues that it has over a ten-year period been unfairly prevented from collecting the full amount of what the Guaranty Association owes. Charging bad faith and vexatious litigation strategy by its opponent, the Trustee seeks attorneys' fees. Such fees were denied below.
¶ 68. The Trustee does not seek punitive damages. In a case involving a similar governmental creation called the Mississippi Insurance Guaranty Association, the Supreme Court held that public policy considerations required "that as a matter of law, MIGA cannot be liable for punitive damages." Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Ass'n, 560 So.2d 129, 134 (Miss.1989). The Trustee accepts the applicability of that principle here.
¶ 69. Attorneys' fees obviously have a different basis than punitive damages. The latter is punishment for misconduct, measured by deterrence impact. The former is reimbursement for the misconduct, measured by actual monetary costs. Though the Supreme Court found that the purposes of the Mississippi Insurance Guaranty Association and by extension the Mississippi Life & Health Insurance Guaranty Association would not permit punitive damages, that is irrelevant to whether either association should be made to account for extraordinary costs it caused an opposing party to incur. A penalty against a governmental body may be an unnecessary *145 inducement for proper conduct. Public policy may be furthered by providing reimbursements for unnecessary expenses.
¶ 70. The Trustee argues that attorneys fees are authorized under the Litigation Accountability Act and Mississippi Rule of Civil Procedure 11. The named statute provides that if a court "finds that an attorney or party ... asserted any claim or defense, that is without substantial justification, or ... any claim or defense asserted, was interposed for delay or harassment," an award of attorneys' fees may be appropriate. Miss.Code Ann. § 11-55-5(1) (Rev.2002). Rule 11 permits an award of fees if a party's pleadings are frivolous or filed in order to delay. M.R.C.P. 11(b).
¶ 71. The most obvious hurdle for the Trustee's argument is an immunity granted by statute to the Mississippi Life & Health Insurance Guaranty Association:
There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer or its agents or employees, the association or its agents or employees, members of the board of directors, or the commissioner or his representatives, for any action or omission by them in the performance of their powers and duties under this article. Such immunity shall extend to the participation in any organization of one or more other state associations of similar purposes and to any such organization and its agents or employees.
Miss.Code Ann. § 83-23-231 (Rev.1999).
¶ 72. The trial court in its final judgment denied the Trustee's request for expenses and fees without stating a reason. Perhaps it was because of the immunity provision, perhaps because of the Bobby Kitchens case, perhaps for other reasons. I will explain next why I find no absolute legal bar to fees. Having concluded that, I also find enough evidence to require a remand.
¶ 73. As with the interest statutes already discussed, we are again faced with a question of statutory construction. Are the costs of litigation, including fees in some cases, within this immunity granted to the state's Guaranty Association? The operative language is that "no liability" shall exist, "and no cause of action of any nature shall arise" against the Guaranty Association, "for any action or omission by them in the performance of their powers and duties under this article." Miss.Code Ann. § 83-23-231. Are attorneys' fees a "liability" or a "cause of action?" Attorneys' fees are not a "cause of action." They are extraordinary costs of litigation regardless of the cause of action. However, attorneys' fees could be considered a "liability" under some definitions of the word. But then, so would normal court costs; indeed, so would be any actual monetary award on the merits of the present litigation. Once "liability" is defined for purposes of the statute, also to be determined is whether that liability arose because of an act or omission in performance of duty.
¶ 74. The original version of this section stated this:
There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer or its agents or employees, the association or its agents or employees, members of the board of directors, or the commissioner or his representatives, for any action taken by them in the performance of their powers and duties under this act.
1985 Miss. Laws ch. 482, § 16 (emphasis added). The 1985 model act prepared by the National Association of Insurance Commissioners included "or omission" after the italicized phrase and did not have *146 the word "taken"; the model also contained this comment: "Each state may wish to review its own statutes to determine whether its Tort Claims Act, if it has one, could be used as an alternative to this section insofar as it applies to the Commissioner or his representative."[6]
¶ 75. In 1990, the legislature made the first sentence conform to the model act by referring to "any action or omission by them in the performance of their duties...." A sentence was added about joining an organization or other state associations who perform similar functions. 1990 Miss. Laws ch. 546, § 10. That latest amendment was identical to the 1988 model act language.[7]
There shall be no liability on the part of and no cause of action of any nature shall arise against any member insurer or its agents or employees, the Association or its agents or employees, members of the board of directors, or the Commissioner or his representatives, for any action or omission by them in the performance of their powers and duties under this Act. Such immunity shall extend to the participation in any organization of one or more other state associations of similar purposes and to any such organization and its agents or employees.
Miss.Code Ann. § 83-23-231 (Rev.1999). This immunity provision, written in the context of a model act that provides for the participation of regulators and solvent insurance companies in the cleanup of financial chaos, is protecting these late-arriving parties from litigation over the reasonableness and good faith of the actions that they take. There is distress and even anger before the cleanup crew arrives, a crew that almost never will be able to put everything back the way that it was. Immunity from being made litigation targets was an understandable decision.
¶ 76. Yet even if no cause of action or liability arises against a member insurer, the insurance commissioner, or a state guaranty association for an act or omission in its performance under this set of statutes, that does not block suits against those entities over the proper amount of coverage that must be provided. The present suit is a perfect example of that. Since that is true, if a final judgment from which no further appeal can be taken is ignored by one of these immune entities, does a court have no ability to enforce through contempt or other sanction? A court must have that authority, or else one of the parties becomes the final arbiter of the litigation, not the court.
¶ 77. If a court can enforce its judgment through contempt, it should have corresponding authority during the course of the litigation to enforce its rules. If an attorney in usual litigation violates Rule 11 by filing a "sham and false" pleading, that person and the client can be sanctioned by requiring the payment of "reasonable expenses incurred" by other parties. I cannot accept that a transgressing party and attorney are made exempt by this statute. I conclude that a court must maintain the ability to police its proceedings if the proceedings are to serve the purpose of resolving disputes that arise under these insurance statutes. Absent authority to require compliance with the *147 usual rules of litigation, the courts lose control of their own function.
¶ 78. Let me also note what I am not saying. This is not a resolution based on the state constitution and separation of powers. It is based only on an effort to determine what the act adopted by the Mississippi legislature means. As a matter of statutory construction, I find that the legislature did not in section 83-23-231 provide an exemption to the Mississippi Life and Health Insurance Guaranty Association from the normal requirements for participation in litigation. The legislature has policy making discretion regarding the courts. See Wolfe v. City of D'Iberville, 799 So.2d 142 (Miss.Ct.App.2001) (Southwick, P.J., concurring) (separation of powers still leaves authority in legislature for policy level choices involving courts). I simply find that by using the twin terms of "cause of action" and "liability," when either arises from acts or omissions in performance of obligations under the statute, the legislature did not create a clear exemption to the imperative that these parties participate in good faith and in compliance with normal rules in litigation.
¶ 79. I am not finding that the Guaranty Association violated any of its obligations. Since the trial court did not explain its denial of this relief, one of the possible bases was a conclusion that fees could not legally be assessed. I find enough evidence to require a remand for further consideration.
McMILLIN, C.J., IRVING AND CHANDLER, JJ., JOIN THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Compounded daily, an interest rate of 9.122% produces a guaranteed interest rate of 9.55%.
[2] Hubert V. Forcier, Investing in GICs: Navigating the Insurance Crisis, Practicing Law Institute, October 28, 1991, 77, 81-82.
[3] Cynthia J. Borrelli, Public Regulation of Insurance Law: Recent Developments, 27 TORT & INS. L.J. 418, 434 (1992).
[4] The Trustee argues that the "date of maturity," when read consistently with another contract provision that the insurance company had "no liability after the date the contract terminates," actually means whatever date is the one at which what should have been done by the scheduled date of maturity finally actually occurs. In that view, the date of maturity has not yet been reached. Simply as a matter of common sense interpretation of a contract provision, I find that the "date of maturity" is the specific one stated in the contract, November 18, 1992.
[5] This may seem inconsistent with an earlier statement about interest on judgments. In my view, the most common-sense reading of section 75-17-7 is that it transforms the general contract rate into the judgment rate and does not require that the contract have an explicit "judgment interest rate." On the other hand, section 75-17-1(1) seemingly requires that the contract provide for an interest rate for the period in question, else the statute provides one. The different phrasing causes me to reach different conclusions about each statute.
[6] Gary E. Hughes, Insurance Products under the Securities Laws: New Regulatory Initiatives, Practicing Law Institute, September 9, 1985, 95, 158.
[7] The 1987-88 Model Act is printed in Wilcott B. Dunhams, Jr., Donal A. Kinney, Insurance Company Solvency: Capital Adequacy, Regulatory Developments, and Liability Issues, Practicing Law Institute, May/June 1991, 277, 305-327.